2019 IL App (2d) 170149
No. 2-17-0149
Opinion filed September 30, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-162 |
| LEAMON R. CAVITT JR., | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial in which he proceeded *pro se*, defendant, Leamon R. Cavitt Jr., was

convicted of possession with intent to deliver over 900 grams of cocaine (720 ILCS

570/401(a)(2)(D) (West 2012)), aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4),

(f)(1) (West 2012)), and aggravated fleeing or attempting to elude a peace officer (625 ILCS

5/11-204.1(a)(2) (West 2012)).  He was sentenced to consecutive prison terms of 30 years, 3

years, and 1 year, respectively.  Defendant, now represented by counsel, appeals, arguing that (1)

the trial court committed reversible error when, in response to the jury's request during

deliberations to view a surveillance-video exhibit, the court restricted the jury's access to the

video, allowing only a single silent viewing in open court, and expressly discouraged the jury's

reliance on the video; and (2) his conviction of aggravated fleeing or attempting to elude a peace officer should be reversed, because the State failed to prove that the officers involved wore "police uniform[s]" (*id.* § 11-204(a), 11-204.1(a)). We reject defendant's second argument, but we conclude that the court committed error in denying the jury's request for the video and conducting the viewing of it. Accordingly, we reverse and remand for a new trial.

¶ 2                                I. BACKGROUND

¶ 3     In January 2012, police officers from Carpentersville and from other law enforcement agencies arranged for an undercover drug operation—specifically, a reverse-buy bust—wherein officers posed as drug dealers, selling one kilogram of cocaine for $29,000 to defendant and Sentoro Dunn. Several officers were assigned to surveillance and security and others were assigned to arrest teams. Streamwood police detective Juan Carrillo and Addison police detective Jose Gonzalez (Gonzalez) posed as the dealers. The operation occurred on January 17, 2012, at a McDonald's restaurant at 1660 Ravine Lane in Carpentersville and resulted in defendant's and Dunn's arrests.

¶ 4                                   A. Trial

¶ 5     Trial commenced on March 14, 2016. Under the State's theory of the case, Carrillo contacted Dunn, who acted as a middleman or broker for defendant, and they negotiated the cocaine's price and quantity and agreed to meet to execute the transaction. During opening statements, the State informed the jury that the surveillance video of the transaction came from the McDonald's security camera and that it was "grainy and spotty video." "And as you will see, the frame rate is a little weak and it only shows one particular vantage point." (The events occurred in the restaurant's west parking lot.) Police testimony, according to the State, would

provide insight from other vantage points. The State then played for the jury a 16-minute, edited version of the video.

¶ 6                                    1. Officer James Schuldt

¶ 7    Carpentersville police officer James Schuldt, who originated and oversaw the operation, testified that he was part of the primary arrest team, which also included Carpentersville officers Kevin Stankowitz, Chris Bognetti, and Joseph Murphy. The primary arrest vehicle they used was a black van with no police markings. The van had curtains over the windows, so that no one could see in but the officers could see out. The four primary arrest officers, according to Schuldt, wore jeans, sweatshirts, and black tactical vests with police markings on the front and back. He explained that the front markings said "police" in white lettering on the upper left chest area and the back said "police" in white lettering "across the entire upper back." The secondary arrest team wore identical clothing. Part of Schuldt's operation plan, which he communicated to all officers, was that the officers, excluding the undercover officers and the two surveillance officers inside the McDonald's, wear clearly visible markings on their clothing so that "everybody knows that we are the police out there."

¶ 8    The team parked a sedan one spot south of the black van as a filler car, so that no civilians would be close to the black van. Schuldt explained that there were two officers just west of Ravine Road, facing east toward the restaurant. Further, the secondary arrest team was in a blue minivan on the northeast side of the restaurant, out of view of the west side where the black van was parked.

¶ 9    The undercover vehicle—a Buick—arrived at the McDonald's and parked two spots south of the black van and next to the sedan. Defendant's vehicle was a tan Cadillac, and it

arrived and parked two spots south of the Buick. A civilian vehicle was between the Cadillac and the Buick.

¶ 10     The operation proceeded. Schuldt testified that, after Carrillo and Gonzalez walked inside the McDonald's, the Cadillac arrived. Schuldt observed two individuals in the vehicle, defendant (the driver) and Dunn (the front-seat passenger). Dunn entered the restaurant and later exited alone and walked to the passenger side of the Cadillac. Schuldt could not see what Dunn and defendant were doing at the car. At some point, while holding a white plastic shopping bag, Dunn walked toward the west side of the restaurant to where Carrillo and Gonzalez were standing. The three men walked to the Buick and stood near the trunk. Dunn then got into the passenger side of the Buick, and Carrillo got into the driver's side. Gonzalez stood near the front-passenger quarter-panel. When Schuldt observed the arrest signal, he and the primary arrest team exited the black van and proceeded to the passenger side of the Buick to take Dunn into custody. Stankowitz, with his gun drawn, and Schuldt opened the front passenger door and Schuldt announced "Police, don't move" and he and his team announced "Police. Police. You are under arrest. Police. You are under arrest." He reached in, grabbed Dunn, removed him from the vehicle, and arrested him, walking him to the rear of the vehicle and, with Bognetti's assistance, placing him in handcuffs.

¶ 11     Schuldt testified that he observed several bundles of money throughout the front of the Buick, including on the driver's seat and the passenger floorboard, and that he observed one kilogram of cocaine in the center console area.

¶ 12     Simultaneous to Dunn's arrest, the blue minivan pulled up behind the Cadillac and attempted to box it in so the officers could arrest defendant. Schuldt saw someone start to get out of the Cadillac and observed the backup lights illuminate. He also saw the minivan's

passenger-side sliding door open, on the side facing the Cadillac. The Cadillac backed up at "a pretty high rate of speed for that short of [a] distance" and struck the minivan as Streamwood corporal Miguel Cabrales began to step out of the minivan. Schuldt heard a lot of shouting and several pops, which he later learned were gunshots. (The minivan was parked behind the Cadillac for less than five seconds before it was struck.) He also observed Gonzalez at the rear passenger side of the Cadillac. The Cadillac then accelerated forward and went down an embankment onto Ravine Road and traveled south, away from the restaurant.

¶ 13    Schuldt retrieved $30,000 in cash from throughout the front of the Buick.

¶ 14                          2. Detective Juan Carrillo

¶ 15    Carrillo testified that, on January 16, 2012, he was asked to participate in a reverse-buy-bust operation with the Carpentersville Police Department. As part of the operation, Carrillo called Dunn that evening. Carrillo stated that he had heard that Dunn was looking for something, and Dunn responded that he had been waiting for the call and was looking for some "groceries," which Carrillo took to mean drugs. Carrillo responded that he had some, for $25,000 or $30,000 (for one kilogram, or about 36 ounces, of cocaine), and Dunn stated that he needed "the good stuff" for his cousin in St. Louis, who would "take the groceries to the kitchen," which Carrillo understood to mean that Dunn's cousin would cook the powder cocaine to make crack cocaine. After several more calls, Carrillo and Dunn agreed that they would meet the following day and that Dunn would buy one kilogram of cocaine for $29,000. Dunn stated that his cousin would bring the "papers," i.e., money.

¶ 16    On January 17, 2012, Dunn told Carrillo over the phone that his cousin had the money and would buy one kilogram of cocaine. Dunn, who was traveling from Rockford, would pick up his cousin from a hotel, and they would meet Carrillo at a McDonald's in Carpentersville.

During the officers' briefing that day, they decided to include Gonzalez as another undercover officer, because the operation involved large amounts of narcotics and currency and unknown individuals with unknown criminal histories.

¶ 17    Gonzalez drove with Carrillo in the Buick to the McDonald's and parked on the west side of the building. The rest of the police team was already there, and the kilogram of cocaine was in the trunk of the Buick. Carrillo and Gonzalez entered the restaurant. Also inside, serving as surveillance and rescue, were Addison detectives Roy Selvik and Greg Garofalo. They were in street clothes and had no markings to indicate that they were police officers.

¶ 18    Carrillo and Gonzalez ordered food and sat at a table on the west side of the restaurant, with a view of the parking lot where they had parked. Dunn called Carrillo to finalize directions and inform him that he was traveling in the Cadillac. The Cadillac drove into the parking lot, drove past the black van, the sedan, and the Buick, and parked two spots south of the Buick. From the restaurant, Carrillo could see Dunn and defendant in the Cadillac. Dunn exited, walked into the McDonald's, exchanged greetings with Carrillo, and went to order food. Also, at one point, Dunn showed Carrillo and Gonzalez his identification. Dunn told the officers that he had the money, and they agreed to conduct the transaction.

¶ 19    Defendant exited the Cadillac, walked toward the trunk, and retrieved something that he took back to the driver's side of the vehicle. Defendant wore a brown baseball cap, a brown shirt, and brown pants.

¶ 20    Carrillo, Gonzalez, and Dunn spent about five minutes in the restaurant and then walked out. The officers remained by the door of the restaurant, and, after Carrillo asked to see the money, Dunn went to retrieve it. He retrieved a white plastic grocery bag from the Cadillac, walked back toward the officers, and opened the bag, which contained bundles of money.

¶ 21    Carrillo suggested that they complete the deal in the Buick. Dunn agreed, and they walked to the car. Dunn sat in the front passenger seat, and Gonzalez stood by the front passenger area. Carrillo retrieved the cocaine from the trunk and walked to the front driver's side. When he opened the door, he saw bundles of money on the seat, some loose and some banded together. He pushed aside the money, sat in the driver's seat, and gave Dunn the cocaine. Dunn put it by his feet. Dunn told Carrillo that there was $30,000 total but that they had to remove $1000 as a finder's fee for him, because he had brokered the transaction.

¶ 22    At this point, Carrillo saw the arrest team approach and heard them yelling, "Police, hands, police, hands." He exited the Buick, and the arrest team arrested Dunn. Carrillo then heard others yelling, "Get the Cadillac, get the Cadillac." Carrillo walked toward the driver's-side door of the Cadillac. Gonzalez then approached, as did the blue minivan. Carrillo identified defendant as the sole occupant of the Cadillac.

¶ 23    Carrillo announced to defendant three or four times, "Police, get out of the car, police, get out of the car." Defendant made eye contact with Carrillo and then looked down and put the Cadillac in gear. Carrillo yelled, "Put the car in park." His gun was drawn, at his chest. Defendant looked over his right shoulder. Carrillo heard the engine rev and the tires spinning. The Cadillac moved in reverse. The blue minivan and Gonzalez were near the rear passenger area. Carrillo moved back along with the Cadillac. Carrillo twice shot his gun in defendant's direction; he did not know if the bullets struck anything. The Cadillac's rear driver's-side corner hit the blue minivan at the front passenger door area, bounced forward, and then again hit the minivan. Carrillo heard gunshots. The Cadillac moved forward at a high rate of speed and drove over a curb and some bushes, down an embankment, and south on Ravine Lane. Carrillo saw that the rear window was broken.

¶ 24    Carrillo wore a black baseball cap, a tan canvas coat, a red shirt, blue jeans, and work boots. His clothing had no markings that identified him as a police officer.

¶ 25    Carrillo testified that the surveillance video does not depict the events in real time. The images are "choppy and it's frame by frame."

¶ 26    On cross-examination, Carrillo stated that Dunn never told him his cousin's name. However, because Dunn said that he would be with his cousin, Carrillo believed that defendant was the cousin.

¶ 27    At this point in the proceedings, defendant played portions of the surveillance video for the jury. Carrillo identified himself, Gonzalez, and Dunn in the video. At time stamp 15:25, Carrillo was at the driver's side of the Cadillac. At 15:27, Carrillo was moving back along with the Cadillac, and at 15:29, the Cadillac struck the blue minivan. (Also at this time, Stankowitz stood in front of the Cadillac.) At 15:31, the Cadillac moved forward. At 14:40, Gonzalez walked toward the front of the Cadillac; at 15:23, he was near the black van; at 15:25, he was near the Buick; and, at 15:29, he was near the rear of the Cadillac.

¶ 28    Carrillo testified that he saw Gonzalez at the corner of the Cadillac before it started moving. He could not recall seeing Cabrales.

¶ 29    On redirect examination, Carrillo testified that, because snow or ice obstructed the video, it does not show him discharging his weapon or the Cadillac striking the blue minivan. Carrillo estimated that he stood next to the Cadillac for only a few seconds.

¶ 30                              3. Officer Kevin Stankowitz

¶ 31    Stankowitz testified that he was on the primary arrest team and was supposed to "arrest" one of the undercover officers and then help out where needed.

2019 IL App (2d) 170149

¶ 32    Stankowitz testified that the Buick was two parking spaces south of the black van, with the sedan in between.  When Stankowitz saw one of the undercover officers give the predetermined arrest signal, Stankowitz alerted the rest of the team, exited the black van, and waited at the rear of the van for the others to exit.  Then, Stankowitz went to the front passenger-side window of the Buick.  His assignment was to get Dunn's attention and open the door for the officers behind him.

¶ 33    Stankowitz knocked loudly on the Buick's window and gave loud verbal commands to Dunn: "police department" and "let me see your hands."  He observed that Dunn was holding money and had a bag of money on his lap.  Dunn attempted to conceal the money by putting it back in the bag.  Stankowitz opened the door, and two other officers placed Dunn under arrest.  Next, Stankowitz "arrested" Gonzalez, to "play off the scenario as if they were not free to leave also."

¶ 34    Stankowitz wore a sweater, a black tactical vest with police markings on the front and the back, and a badge around his neck.  He also had a firearm on his right hip.  Schuldt, Bognetti, and Murphy also wore black vests with the same police markings.

¶ 35    After he "arrested" Gonzalez, Stankowitz turned his attention to the Cadillac.  He saw Carrillo standing at the driver's side of the Cadillac, giving verbal commands and pointing his weapon toward the vehicle.  Stankowitz walked toward the Cadillac, and Carrillo continued to give commands.  The Cadillac started backing up when Stankowitz was near the front of the vehicle next to the Cadillac.  The blue minivan was about three to four feet behind the Cadillac at this point and Stankowitz saw Cabrales exiting the minivan at the side passenger door closer to the Cadillac.  The Cadillac backed into the minivan in a "[v]ery quick manner."  Stankowitz moved to the front passenger side of the Cadillac.  He placed his hands on the hood as it came to

a stop, looked at defendant, who looked back at him, and yelled "police" and told him to stop the car. The Cadillac moved forward, and Stankowitz quickly had to move out of the way to avoid being struck. Cabrales, who was near the rear of the Cadillac, discharged his weapon. Stankowitz never drew his weapon, because there was a crossfire issue.

¶ 36     The Cadillac quickly drove through the parking lot and down an embankment. Its rear window shattered from being shot.

¶ 37     Stankowitz testified that the surveillance video did not show everything as it occurred from his perspective. It was "very choppy" and did not show, for example, when he "arrested" Gonzalez.

¶ 38     On cross-examination, Stankowitz testified that Cabrales fired his weapon as the Cadillac started moving forward. Stankowitz did not see Cabrales get struck by the Cadillac.

¶ 39     At this point, defendant played portions of the video. Stankowitz identified himself, at time stamp 15:28, in front of the sedan. He stated that, at 15:29 or 15:30, he appeared to be putting his hands on the Cadillac's hood but could not be certain, due to the video's lack of clarity and "it not playing all the way through."

¶ 40                              4. Officer Joseph Murphy

¶ 41     Murphy testified that he was assigned to the primary arrest team. From his position in the black van, Murphy could not see outside. After the arrest signal was given, Murphy alerted everyone on the police radio and exited the van on the north side, out of the Cadillac's view.

¶ 42     After Dunn was arrested, Murphy ran to the rear of the Cadillac, heard the engine rev, and saw the vehicle start to move in reverse. To avoid being struck, Murphy moved to the driver's side, toward the trunk. He saw the Cadillac strike the blue minivan. Officers were shouting orders. The engine started to rev again, and Murphy heard gunshots. The Cadillac

drove out of the lot, went down an embankment, and turned left onto southbound Ravine Lane. The tires were squealing, and the engine was very loud. It was traveling fast.

¶ 43    Murphy testified that the weather conditions were icy and snowy. There was a lot of snow on the ground. Murphy wore blue jeans, a sweatshirt, and an outer vest carrier that had police lettering on the front and back. He also wore a badge on his belt clip and held a firearm.

¶ 44    On cross-examination, Murphy testified that he saw Cabrales shooting. He did not see the Cadillac strike Cabrales. Murphy saw the Cadillac strike the blue minivan twice and heard gunshots before and after it struck the minivan the second time.

¶ 45                              5. Sergeant Paul Murray

¶ 46    Murray was part of the secondary arrest team, along with Carpentersville sergeant Ostrem and Cabrales. Initially, the blue minivan was parked on the northeast side of the McDonald's lot, to avoid being seen by Dunn and defendant. After the arrest signal was given, the minivan moved and parked behind the Cadillac. As it came to a stop, Cabrales started exiting the van via the passenger-side sliding door. Murray, who sat in the front passenger seat, had his hand on the door handle, about to exit, when he saw the Cadillac's backup lights come on and heard the engine rev. The Cadillac struck the minivan, knocked Murray from his seat "almost" to the driver's-side floor "tub area." He felt two additional but smaller impacts as he tried to get back up to exit the minivan. Murray then heard several muffled pop sounds, which he later learned were gunshots. He ducked and tried three times to open the door. He finally exited the minivan, because the Cadillac had moved away. He unholstered his weapon. Cabrales stood to his right and fired once. The Cadillac drove away from the area.

¶ 47  Murray walked over a berm to ensure that the Cadillac was gone.  He returned to the scene and determined that three officers had fired their weapons.  He learned that Cabrales was struck by the Cadillac and needed medical attention.

¶ 48  Cabrales wore a raid jacket, which is a windbreaker with black police markings on the front and back.  He also wore a vest with police markings in a different color on the front; the windbreaker covered the police markings on the back of the vest.  Murray himself wore a light tan shirt with no police markings and a vest with police markings in gold.

¶ 49  During cross-examination, defendant played the surveillance video and had Murray describe certain actions depicted therein.  At time stamp 15:28, the Cadillac began backing up.  Because of the snow, Murray was unsure if this was when the Cadillac struck the minivan.  At 15:31, Murray tried to pick himself up.  When Murray exited the minivan, the Cadillac was facing west and moving slowly.  When Cabrales fired his weapon, the Cadillac pulled forward.

¶ 50  On redirect, Murray testified that the video did not fairly and accurately depict all of the events that occurred.  First, because it is a frame-by-frame video and not in real time, some action is missing between the frames.  Second, there is no sound.  Third, the officers' perspectives were different from that portrayed in the video, which consists of an overview of the parking lot.

¶ 51                                          6. Dr. Joseph Ogarek

¶ 52  Dr. Joseph Ogarek, an emergency room doctor at Lutheran General Hospital, treated defendant.  He asked defendant what brought him to the hospital, and defendant replied that he was involved in a shooting.  Defendant also stated that he was the driver of a vehicle and that he thought he was involved in a suspected drug deal.

¶ 53    On cross-examination, Ogarek testified that defendant was in critical condition at the emergency room, but he agreed that defendant was not "on anesthetics" and was alert and oriented to person, time, and place. Defendant had been shot in the cheek and had three holes in his back consistent with gunshots.

¶ 54    On redirect, Ogarek testified that defendant's responses to questions were logical and that he was coherent the entire time.

¶ 55                              7. Corporal Miguel Cabrales

¶ 56    Cabrales testified that he was part of the secondary arrest team. He wore a Streamwood beanie with a badge that said "police officer," a long-sleeved black shirt that said "police" along the sleeves, an armor life vest that said "police" in white lettering on the front and back, a police lanyard with his ID on it that said "police," a hanging badge for the police department, a badge on his belt, blue jeans, and gym shoes.

¶ 57    Once the blue minivan stopped behind the Cadillac, Cabrales exited the minivan, saw the brake and reverse lights activate on the Cadillac, heard the engine revving, and heard the tires spinning. The minivan was two to three feet behind the Cadillac. As Cabrales's feet hit the ground, the Cadillac hit him and the right rear panel of the minivan. The upper portion of his body flew forward onto the Cadillac's trunk. While he was on the Cadillac, it moved forward and back again. When he got to the right rear of the Cadillac, he heard two gunshots. Cabrales looked inside the vehicle and saw defendant looking at him. Thinking that defendant shot at him, Cabrales retrieved his weapon and fired into the Cadillac seven times. Carrillo was the only other officer he saw as he fired his weapon. Cabrales suffered a bruised left thigh.

¶ 58    On cross-examination, Cabrales testified that the Cadillac was parked at a 45-degree angle and that the right rear portion simultaneously struck him and the minivan.

¶ 59                              8. Detective Roy Selvik

¶ 60     Selvik testified that he and Garofalo, his partner, were assigned as inside surveillance and safety for the undercover officers. Selvik and Garofalo were dressed in plainclothes with no identifiable markings.

¶ 61     While Selvik sat at a table with a view of the west parking lot, he saw the Buick arrive. Carrillo and Gonzalez entered the restaurant and sat at a table. Selvik could see them but could not hear their conversation. He also saw the Cadillac arrive. Dunn and defendant exited the Cadillac and walked to the rear of the vehicle. They talked, and then Dunn walked into the restaurant. Defendant opened the trunk, retrieved a white grocery bag that had some items inside, and got back in the driver's seat.

¶ 62     Dunn sat and spoke with Carrillo and Gonzalez. He then got up, ordered food, and returned to the table. They conversed and then got up and exited through the west door. Carrillo and Gonzalez remained near the door, and Dunn walked to the Cadillac, retrieved from the passenger side the white bag, walked back toward the officers, and showed them the bag's contents. The three men then walked to the Buick. Gonzalez walked toward the passenger side, near the trunk area; Dunn entered the passenger side; and Carrillo entered the driver's side. Then, Gonzalez walked toward the front passenger side, and Carrillo walked to the trunk and opened it.

¶ 63     While Selvik and Garofalo were still inside the restaurant, they saw Carrillo pull out a bag from the Buick's trunk, go back to the driver's side, and enter the car. A few moments later, Gonzalez gave the "bust" signal for the primary arrest team to come. Selvik and Garofalo exited the restaurant to assist the arrest team as they pulled up in the black van. Several officers exited

the van. They were dressed in plainclothes but with identifiable police markings, tactical vests, and badges on their belts. They went to the passenger side of the Buick.

¶ 64    Selvik also observed the blue minivan arrive, and he and Garofalo went to assist the secondary arrest team, because Dunn had already been taken into custody. They walked around the back of the minivan, on the passenger side. Selvik saw Carrillo run to the driver's side of the Cadillac, shouting "Police, police." Gonzalez was on the passenger side. Selvik saw Cabrales exit the minivan.

¶ 65    Selvik saw the reverse lights activate on the Cadillac, Cabrales jump out of the way, and the Cadillac strike the minivan. He was not aware if Cabrales had been struck.

¶ 66    On cross-examination, Selvik described various events in the video. He testified that the conversation between defendant and Dunn by the trunk of the Cadillac was not depicted in the video. Selvik heard gunshots but did not see anyone shooting.

¶ 67                              9. Detective Jose Gonzalez

¶ 68    Gonzalez corroborated Carrillo's account of Dunn's and defendant's arrival at the McDonald's. Gonzalez testified that, when Dunn entered the McDonald's, Gonzalez noticed a large bulge on his right side. Gonzalez was concerned that it was a gun. While Dunn was ordering his meal, Gonzalez alerted Carrillo to what he had observed and they agreed that Gonzalez would confront Dunn about it. After Dunn returned to the table, Gonzalez asked about the bulge. According to Gonzalez, Dunn stated that "it is all cool" and moved his shirt to reveal that he had two cell phones in his waistband.

¶ 69    During the meal, Gonzalez asked Dunn if he had the money for the cocaine, and Dunn replied that he did. When the three men exited the restaurant, Dunn went to the Cadillac's passenger side and retrieved a white plastic bag. When he returned to Gonzalez and Carrillo, he

stated, "you see, I'm legit, I got the money." He opened the bag and showed them large bundles of money. The three men then walked to the Buick. Gonzalez stopped at the rear of the vehicle and, for safety reasons, scanned the parking lot and looked at the Cadillac. Carrillo sat in the Buick's driver's seat, and Dunn sat in the passenger seat. The trunk popped open, and Carrillo walked to the trunk to retrieve the cocaine, while Gonzalez walked to the front passenger-side quarter panel (to keep an eye on Dunn, to be on the lookout to ensure the officers' safety, and to be in position to give the arrest signal). Carrillo returned to the driver's seat, but had to push away stacks of money that Dunn had placed on the seat. Dunn handed Carrillo stacks of money, and Carrillo handed Dunn the cocaine. Gonzalez then gave the arrest signal to the primary arrest team.

¶ 70    The primary arrest team arrived on foot at the passenger side of the Buick and took Dunn into custody. Gonzalez walked away from the arrest team and toward the restaurant. He heard someone yell, "get the Cadillac, get the Cadillac." He and Carrillo walked toward the Cadillac. On his way, he heard Carrillo yell to defendant, "stop, police, get out of the vehicle." Gonzalez also ordered defendant to get out of the vehicle and identified himself as a police officer. He and Carrillo ordered defendant to put the vehicle in park.

¶ 71    However, Gonzalez saw the reverse lights come on and the Cadillac move in reverse. Gonzalez drew his gun and saw the Cadillac strike Cabrales on his upper leg area. Gonzalez was concerned that the Cadillac was going to crush Cabrales and strike Carrillo and himself. Gonzalez raised his gun and began firing at defendant; at the time, he believed that he had fired about five rounds, but he came to learn that he had fired more rounds.

¶ 72    When the Cadillac moved forward, Gonzalez was not aware of any officers besides Cabrales and Carrillo. The Cadillac drove over an embankment, turned left, and fled.

¶ 73    Gonzalez testified that the surveillance video was not a fair and accurate depiction of what occurred, because the images were like snapshots, it was not a continuous recording, it was not in color, there was snow over the lens, there was no audio, and the angles were not ideal. It did, however, depict some of the events. Gonzalez also viewed People's exhibit No. 23, which consists of 16 minutes of the surveillance video, beginning about 30 seconds before the Cadillac arrives at the McDonald's and ending about 30 seconds after it leaves. The 40 to 45 minutes of footage that are excluded contain nothing relevant. Exhibit No. 23 was admitted into evidence and played in open court. The trial court gave the jury a limiting instruction that it was not to determine time based on either video and that the time stamps did not accurately reflect the time that had elapsed. It could, however, use them to observe what happened in the parking lot and the sequence of events.

¶ 74    On cross-examination, Gonzalez testified that he was at the rear passenger side of the Cadillac the entire time he was firing his weapon. At this point, defendant played portions of the surveillance video. At time stamp 16:07, Gonzalez identified himself standing at the rear of the Buick, wearing a black jacket with lettering on the back. At 17:04, Gonzalez identified himself at the rear driver's side of the minivan. At 17:13, he could not identify the individual in the frame.

¶ 75    Gonzalez admitted that, when he stated that Dunn said that he had the money, Gonzalez could not recall if Dunn said "he," in the singular, or "we," plural. Dunn never referred to defendant as his cousin in Gonzalez's presence.

¶ 76                    10. Detective Victor Lizotte

¶ 77    Carpentersville detective Victor Lizotte testified that he was part of the surveillance team, stationed in unmarked Ford Taurus, with Carpentersville detective Jorge Gonzalez. They were parked in a strip mall parking lot, across from the McDonald's, on the other side of Ravine Lane.

¶ 78    After the Cadillac drove over the embankment and turned left onto Ravine Lane, Lizotte and Jorge Gonzalez pursued the Cadillac. The Taurus was equipped with low-profile lights and a siren. The low-profile lights were below the visor area and in the grillwork; they consisted of red and blue lights that flashed when activated. The vehicle had no decals and no light bar on top.

¶ 79    Lizotte activated the lights and the siren while pursuing defendant. The officers followed defendant south on Ravine Lane, then east on North Lake Parkway, then south on Route 25. At the intersection of Routes 25 and 68, the Cadillac stopped when it encountered traffic. The Taurus was directly behind the Cadillac.

¶ 80    Lizotte and Jorge Gonzalez exited the Taurus and approached the Cadillac. Lizotte approached on the driver's side and Jorge Gonzalez on the passenger side. Lizotte yelled, "Police, put your hands up." Lizotte had his gun drawn at "low ready," which is at a 45-degree angle and aimed in the general direction of the target. At this point, the rear window had been shot out and the driver's-side window had a softball-sized hole in it. Lizotte could not "see very much" inside the car. He grabbed the door handle, but the door was locked. He then struck the window to knock out more glass.

¶ 81    Defendant, whose hands were on the steering wheel, turned, and his right hand dropped down along his right leg and then came up. He turned toward Lizotte, and Lizotte saw a dark object in defendant's hand. Lizotte believed that defendant was "going for a gun," and he fired a round at defendant. He was unaware if a bullet struck him.

¶ 82    Defendant then continued south on Route 25.  Lizotte and Jorge Gonzalez returned to the Taurus, and a marked squad car, with lights and siren activated, pulled in front of their vehicle and continued south on Route 25.

¶ 83    Lizotte wore a shirt, tie, and jacket, with a badge and a gun on his belt.  Underneath his jacket he wore a tactical outer carrier vest with a police emblem on it.  Jorge Gonzalez was similarly dressed.

¶ 84    On cross-examination, Lizotte testified that, after he broke off some of the window glass, he could partially see defendant's face.

¶ 85                              11. Officer Brad VanHorn

¶ 86    Carpentersville officer Brad VanHorn testified that, while on his lunch break on January 17, 2012, he heard Murphy on the police radio state that shots had been fired.  VanHorn was aware of the reverse-buy operation at the McDonald's, so he drove his marked squad car north on Route 25.  VanHorn also heard on the police radio a description of the Cadillac and its direction of travel.  He saw a Cadillac that matched the description exceeding the speed limit. VanHorn activated his car's lights and siren, made a U-turn and followed the vehicle. Eventually, VanHorn caught up to and was immediately behind the Cadillac.  They headed east on Route 72, through East Dundee, South Barrington, and Hoffman Estates.  They traveled over 80 miles per hour in sleet and snow.  The Cadillac ran red lights and drove on the median in both the left and right lanes, in violation of traffic laws.  At Route 72 and Gannon Road, VanHorn lost sight of the Cadillac.

¶ 87    VanHorn approached a Hoffman Estates patrol unit that had stopped traffic at Route 72 and Golf Road.  He followed that unit and then several others that he believed had information about the pursuit of defendant.  Ultimately, VanHorn saw the Cadillac stopped at an Itasca

McDonald's. There were about 25 squad cars in the restaurant parking lot. Defendant was on the ground and his face was bleeding.

¶ 88 VanHorn further testified that his squad car had a dashboard video camera that activates when the emergency lights are turned on or when it is manually activated. He reviewed the video from the incident and stated that it fairly and accurately portrays the events that day. People's exhibit No. 5, a nine-minute video, was admitted and published for the jury.

¶ 89                    12. Angela Mathews

¶ 90 Mathews, a crime-scene investigator for the Illinois State Police, testified that she assisted with processing the crime scenes in Carpentersville. On January 18, 2012, she participated in executing a search warrant on the Cadillac. The vehicle was registered to defendant, at 1659 North 36th Street, East St. Louis. Mathews located on the driver's seat a Sprint rebate form in a bloodstained, sealed envelope that had defendant's name and address on it.

¶ 91 On cross-examination, Mathews testified that the Cadillac had 31 defects on the exterior and interior. There was also damage on one side. Some of the defects were consistent with bullet holes and some of them indicated a left-to-right trajectory. There was blood on the steering wheel and the dash area, the center console, and the front seats.

¶ 92                    13. Sergeant Matt Ostrem

¶ 93 Carpentersville sergeant Matt Ostrem drove the blue minivan with the secondary arrest team. He was assigned to block the vehicle the suspects arrived in and take them into custody. Also in minivan were Murray and Cabrales.

¶ 94 Ostrem parked the blue minivan behind the Cadillac to prevent it from leaving. His team was to exit the minivan and arrest any occupant of the Cadillac. When the minivan stopped,

Ostrem heard the passenger-side sliding door open. Moments later, Ostrem saw the Cadillac's reverse lights come on. He heard the tires screeching on the icy pavement and saw the Cadillac back into the van. He felt it strike the minivan, rocking it left and right. Murray fell in between the two front seats. Ostrem could not see Cabrales. The minivan sustained a dent in the front third of the passenger door.

¶ 95    After the Cadillac hit the minivan, the Cadillac rolled away about one or two feet and then, with the tires still spinning in reverse, it hit the minivan a second time. The reverse lights then went off, and the tires started spinning forward. The Cadillac accelerated rapidly over a curb, traveled down an embankment, and continued onto Ravine Lane.

¶ 96    As the Cadillac rammed the minivan, Ostrem, Murray, and Cabrales were discharging their firearms. Once the Cadillac fled, Ostrem exited the van.

¶ 97    Sometime later, Ostrem went to the Buick with Schuldt to collect evidence. He observed money scattered about the front seat. The officers collected the money. Later, the officers counted the money, which totaled $30,000.

¶ 98    Ostrem also testified as an expert on narcotics possession, possession with intent to deliver, and delivery. He opined that the cocaine seized in this case was possessed with the intent to deliver, not for personal use. The main factor in support of this conclusion was the amount of the cocaine—over 900 grams—which is well beyond any personal-use amount. Another factor was that defendant traveled a great distance, from East St. Louis, to purchase the cocaine. A normal user would not travel six or seven hours to purchase cocaine. Traveling with cocaine would risk arrest, and one would undertake that risk only "when the return on investment is greater than using it." The cocaine would be broken down into smaller amounts and sold for profit.

¶ 99    On cross-examination, Ostrem testified that he could not recall if he saw someone standing by the driver's side of the Cadillac when he approached it. As he pulled up, Ostrem recalled, Stankowitz was by the front right corner of the Cadillac.

¶ 100                              14. Rhonda Earl

¶ 101    Rhonda Earl, a drug chemist for the Illinois State Police Division of Forensic Services, testified as an expert on narcotic analysis and identification. She testified that the substance seized weighed 993.3 grams and tested positive for cocaine, which is a controlled substance.

¶ 102                              15. Sergeant Jon Plimpton

¶ 103    Plimpton, a Village of Schaumburg police sergeant, testified that he was working patrol on January 17, 2012. At 12:50 p.m., he received a radio dispatch with information that police officers were pursuing a Cadillac traveling east on Route 72. Later, he learned that the Cadillac was proceeding east on Bode Road, which runs into Schaumburg. The Cadillac then traveled on Roselle Road and Schaumburg Road. Plimpton alerted other officers and had stop sticks, which are hollow spikes intended to deflate tires, set up near Plum Grove Road. As the Cadillac approached Plum Grove Road, defendant slammed the brakes, made a U-turn, and avoided the sticks. Defendant then traveled west on Schaumburg Road. Plimpton drove east, saw the Cadillac, and drove across lanes of traffic to try to pin the vehicle, but it sped past him. Plimpton and other officers, who were all in marked squad cars (Plimpton's car and the cars in front of him had their sirens and lights activated), pursued the Cadillac. The chase proceeded through Schaumburg and Elk Grove Village to Irving Park Road, traveling at speeds from 40 to 80 miles per hour. Ultimately, Plimpton's squad car was immediately behind the Cadillac and they proceeded east on Irving Park Road. At Prospect Avenue in Itasca, defendant made a hard left turn into a McDonald's parking lot. As defendant came to a stop, Plimpton pursued him into the

lot. Plimpton observed defendant lean over the passenger side of the vehicle, as if trying to retrieve something.

¶ 104 Plimpton pulled behind the Cadillac, opened his driver's-side door, and took cover behind it. He drew his sidearm and instructed defendant to put up his hands and to lie on the ground. Defendant complied. After backup arrived, Plimpton arrested defendant and had other officers contact paramedics. Plimpton's squad car was not equipped with a dash camera. The State rested.

¶ 105                                    16. Defendant

¶ 106 Defendant testified in his own defense. He stated that he met Dunn around August or September of 2011, when Dunn expressed an interest in investing in defendant's record label. On January 17, 2012, defendant, who was in Chicago, went to Rockford to meet with Dunn. Dunn's driver's license had been suspended for DUI, so defendant drove Dunn to Carpentersville because Dunn wanted to meet someone.

¶ 107 They arrived at the McDonald's, and defendant believed that Dunn wanted only to get some food. However, Dunn asked defendant to get a bag out of the trunk.

¶ 108 Defendant sat inside his car, listening to music. He could not see Dunn being arrested two cars away. Carrillo approached defendant's car, tried to open the door, and asked defendant to exit the car. Carrillo was not dressed as a police officer. Defendant immediately put the car in reverse and tried to back out of the parking spot. He saw the blue minivan behind him, stepped on the brakes, and bumped the vehicle. Because Carrillo was standing to his side with a gun, defendant "immediately out of reaction put my car into drive and drove forward." As he drove forward, he heard shots. Defendant continued driving and he was hit in the face by a bullet that came through the back window. "I am trying to process the fact that somebody either

shot me in front of the police or the police just shot me. So what I did is I just kept driving. I drove until I was for sure that I saw a bunch of police officers, a lot of police officers." When he saw the officers, he pulled into the Itasca McDonald's and surrendered.

¶ 109 On cross-examination, defendant testified that he met with Dunn on January 17, 2012, at about 10 a.m., and the two went to Carpentersville. "He told me he was going to meet someone but he didn't tell me the reason why." Defendant stated that he did not know that the white plastic bag contained $30,000 in cash. He further testified that he did not see Dunn come out of the restaurant and walk to the Buick with two other individuals. Nor did he notice the police activity there, including the four police officers screaming at the Buick. Defendant was listening to music and was parked between two sport utility vehicles.

¶ 110 When Carrillo approached his car, defendant did not hear him announce that he was a police officer. Defendant thought that he was going to be robbed or shot. He felt only one impact with the blue minivan. He did not see any other officers by his vehicle.

¶ 111 After defendant drove over the embankment and onto the road, he was shot. He drove to his left and down another road and then stopped behind traffic. While he was stopped, he saw red and blue police lights on a vehicle behind him and heard police sirens. He did not stop to speak to the police officers about what happened. He kept driving after "someone smacked on my window." He did not see that person, as he was looking at the woman in the car in front of him, who was looking at defendant with fear on her face. The person who smacked his window, according to defendant, did not yell "police, put your hands up" or order him to get out of his vehicle. Defendant drove off and ended up 20 miles from where he was initially shot. At some point, he was aware that police officers were following him. He saw squad cars behind him, with lights and sirens. Defendant did not want to be stopped by the police that day, but he was

not trying to avoid them. Defendant testified that he was not familiar with the area and was looking for a place to stop where he could see a lot of people. He had not been aware that more than two squad cars were following him. However, he said, two or three would not be enough for him to stop, "not when [he had] been shot" and "if they [were in] the same department."

¶ 112   Defendant denied making a U-turn to avoid a roadblock. Defendant rested.

¶ 113                                    17. Surveillance Video

¶ 114   The 16-minute surveillance video shows defendant and Dunn arriving in the Cadillac. It also shows defendant retrieving the plastic bag from the trunk, Dunn returning to the Cadillac from the restaurant and retrieving the bag, the blue minivan arriving and stopping behind the Cadillac, officers surrounding the Cadillac, and defendant backing up toward the blue minivan and then fleeing forward over the embankment. The center of the lens is blocked by ice or snow, and, as related at trial, the images are choppy.

¶ 115                         B. Closing Arguments and Exhibits Conference

¶ 116   During closing arguments, the prosecutor commented, "You look at that video for what it's worth" and "We showed you the video for what it was worth."

¶ 117   Defendant, during his closing, asserted that there were discrepancies in the testimony of the officers who were shown in the video.

¶ 118   During rebuttal, the State argued:

> "Ladies and gentlemen, nothing in the law says this video has to be—this crime has to have been captured on the video in order for you to find the defendant guilty. You have seen the video. You have seen what it shows. You have seen what it doesn't show.
>
> Also you know what it doesn't show? It doesn't show an arrest signal but it should be on there because it's in the viewing area.

You know what else it doesn't show? Three officers discharging their firearms. Keep that in mind if you have the opportunity to look at that video again in assessing how much it helps you. You cannot watch that video and decide from that video alone what happened in this case, ladies and gentlemen. You have to rely on the testimony much like you would if that video didn't even exist. So look at that testimony. Judge the credibility of the testimony. Use your common sense. Does [*sic*] the things that the witnesses testified to make sense? Test it against each other. Look at the bias of the defendant that he has in getting on that witness stand and testifying. Test all of that, ladies and gentlemen. Look at the corroboration. Look at the credibility. Use your common sense."

¶ 119 After closing arguments, during the conference concerning the admission of the exhibits, defendant asked that the jury be given the surveillance video. The prosecutor commented that the State was not asking for the video to go back to the jury, "based on my previous experience of judges sending videos back. They need to have equipment to play it, make sure they can't look at anything else." The trial court denied defendant's request, stating, "I am not going to send back the video at this point." Further,

"[THE COURT:] If they ask for the video, then I am going to arrange something for them to do. In any event, I am not sending them back. If they ask to see the video, within my discretion, I will make my final decision then, but probably what I am going to do is have them come back in the courtroom and look at it again—

THE DEFENDANT: Okay.

THE COURT: —because I want—you'd have to send equipment back there. I can't control how many times they look at it. They could control it. They could look at it

a thousand times. I think that's unfairly highlighting certain evidence, so I am not going to send any videos back.

If I get a question or request, then we will deal with it at that time. So over—I am going to deny defendant's request to send videos back."

¶ 120                                C. Jury Deliberations

¶ 121   During deliberations, the jury sent a note to the court, asking for the full surveillance video on a computer. Before the State and defendant, the court stated: "We thought this may happen. The part that bothers me, of course, is the full video aspect of it. I am not going to let them take the laptop back there. We are going to play it once in the courtroom." The State confirmed that the full video had been admitted but not published. The court stated, "Can't do that then." The State further confirmed that it had played the 16-minute video.

¶ 122   The trial court asked defendant if he had any response or comment, and he replied, "No." He did, though, object to the video being played on a television rather than a larger screen. The court overruled his objection.

¶ 123   The trial court decided that the 16-minute video would be shown to the jury. It also proposed that the video could not be stopped and that there would be no questions. The State and defendant had no objection. The trial court decided that the video would be played on a television stationed by the jury box.

¶ 124   With the jury back in the courtroom, the court stated, "I am going to play the video for you. We are going to look at it in the courtroom here. I am going to play the video." It further explained:

"Now, the process by which we are going to do this is no questions can being [*sic*] asked. No lawyers are going to talk to you. Nobody is going to talk to you but me

and we are going to run through that 16 minute video, People's 23, one time.

I don't know if you retained all of your notebooks and everything because you can take notes if you wish to do that.

We will run that through one time. I am not going to run through it again. We can't answer any questions you may have based on that video. You have to look at it yourself and draw whatever determinations or whatever information you can from that.

Let me explain a little bit, just so you understand, and the reason I am doing it this way is because in my experience, if you send the video back there, that [*sic*] it could be viewed a thousand times. Now, there is no other evidence that you are going to view a thousand times, just that evidence. That's—there is no other evidence you are going to view twice like you are the video in this matter or this particular video.

I don't think it's fair to the parties to overemphasize one piece of evidence over any other piece of evidence. That's how this thing gets played out.

If you asked me if could [*sic*] bring some other witnesses and put them back on the stand, see, we couldn't do that. We can't do—you can't be given that more than one—more than the time that they are allowed to you, so we will do it once. I understand that it's significant. I find it's fair. We can do it one time.

It's not fair for any lawyers to say anything or the defendant to say anything. We are just going to view it in silence. When we are done, we will send you back to the jury room to further your deliberations."

¶ 125                          D. Verdicts and Subsequent Proceedings

¶ 126 The jury returned guilty verdicts on all counts: possession with intent to deliver over 900 grams of cocaine; attempted first-degree murder of Stankowitz (720 ILCS 5/8-4(a), 9-1(a)(1)

(West 2012)); aggravated battery of Cabrales, Murray, and Ostrem; and aggravated fleeing or attempting to elude a peace officer.

¶ 127 Defendant filed a motion for a new trial. He raised several issues, including the sufficiency of the evidence and the trial court's refusal to allow the jury to have the surveillance video in the jury room. On November 3, 2016, the trial court denied defendant's motion but entered judgment notwithstanding the verdict on the two counts of attempted first-degree murder, finding that defendant had intended to elude, not to kill, Stankowitz. In announcing its ruling, the court noted that it had reviewed the transcripts and "the video recordings that were submitted at trial, *both the edited version and also submitted as an exhibit was the unedited version*. I looked at *both* of those again to refresh the Court's memory." (Emphases added.) Explaining its denial of the jury's request for the surveillance video in the jury room, the court stated:

> "I do have—the reason I don't do that is because I feel that if you leave the video in the jury room with the jury with the means to play that video, then it cannot be controlled of [*sic*] how many times they look at it. I suppose I could order them to only look at it one time, but, again, I find when I leave it at their control, that I have no way of knowing whether that actually occurred. Whereas, if I show them the video one time in the courtroom without any questions being asked, just the viewing of the video, obviously the amount of time that they view that video is completely controlled, and I think that's more fair to all the parties involved. That's my reason why I just exercised my discretion and did it that way."

¶ 128 In addressing the attempted-murder charges, the trial court commented:

"The video itself is choppy when viewing this particular situation. *I viewed it several times, both videos*, to get a very good—to try to see what information I could glean from the admitted videos; and, again, the time lapse on the trial counter was not accurate as to the time, so that was not helpful. And, again, the video is somewhat choppy. I did see an officer there. I did see, I think it was, an officer, a person move a step or so backwards from the car before the car went down the embankment."

¶ 129   The trial court sentenced defendant to 30 years' imprisonment for possession of cocaine with intent to deliver; 3 years' imprisonment for aggravated battery to a peace officer; and 1 year imprisonment for aggravated fleeing or attempting to elude a peace officer. It further found that consecutive sentences were necessary to protect the public and thus ordered that the three prison terms be served consecutively. Defendant, now represented by counsel, appeals.

¶ 130                                 II. ANALYSIS

¶ 131                         A. Surveillance Video

¶ 132   Defendant argues that the trial court committed reversible error when, in response to the jury's request to view the surveillance video, the court allowed only a single, silent viewing in open court and expressly discouraged the jury's reliance on the video. For the following reasons, we agree.

¶ 133   Initially, we note that defendant acknowledges that he did not object when the court imposed the restrictions in the middle of the deliberations (although he did do so at the outset of the deliberations and in his posttrial motion, arguing that the video should have been given to the jury). Thus, the issue was forfeited and may not be considered on appeal, unless there was plain error. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him [or her]. *** In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Keene*, 169 Ill. 2d 1, 17 (1995). Prejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' (Emphasis in original.) *People v. Blue*, 189 Ill. 2d 99, 138 (2000). In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 134 The defendant must first establish that a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 497-98 (2009). " '[T]he plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed.' " (Emphasis in original.) *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) (quoting *People v. Hampton*, 149 Ill. 2d 71, 102 (1992)).

¶ 135 Defendant argues that the trial court's response to the jury's request to view the video during deliberations was erroneous in three ways: (1) it violated the privacy of deliberations by requiring that the jury be silent while viewing the video in open court in the presence of the judge, the parties, counsel, court personnel, and spectators; (2) it limited the jury to a single

viewing; and (3) it invaded the jury's role as fact finder by admonishing the jury that repeated viewings of the video would improperly emphasize that exhibit over other evidence in the case. Defendant asserts that the fallacy of the trial court's restrictions and admonishments was made plain after trial, when the court itself relied on its own repeated viewings of the video to overturn the jury's verdict on the most serious counts—attempted first-degree murder. He urges that the court's actions deprived him of a fair trial and that this court should reverse his convictions and remand for a new trial. In defendant's view, the video was key evidence used by both the State and the defense to support their theories of the case. Further, during trial, everyone acknowledged the video's poor quality, including that there was ice or snow on the lens and that the footage was not continuous or seamless. On the latter point, the court admonished the jury that the video was "choppy" and that it should not use the timer displayed on the screen to measure the actual time of the events. Defendant notes that the State played the video during opening statements, indicating, from the commencement of the trial, the video's significance. Further, the State's witnesses testified regarding the video to support their versions of the events. Defendant, in turn, testified that he did not know that the people who approached him were police officers, and he played a portion of the video that emphasized its limitations and the ways in which it did not support the officers' testimony. He notes that Stankowitz admitted on cross-examination that the video did not show his hands on the hood of the Cadillac. Also, Murray testified that he felt the blue minivan receive multiple impacts, but, on cross-examination, he admitted that the video showed defendant's car go forward only once after it backed into the minivan.

¶ 136  The trial court has discretion to assess a jury's request to review evidence, including which exhibits jurors may have in the jury room. *People v. Rouse*, 2014 IL App (1st) 121462, ¶

77. We will not reverse the trial court's decision unless it was an abuse of discretion. *Id.* An abuse of discretion occurs where no reasonable person would take the court's view. *People v. Chambers*, 2016 IL 117911, ¶ 68.

¶ 137   "It is a basic principle of our justice system that jury deliberations shall remain private and secret. [Citation.]  The primary purpose of this honored rule is to protect the jurors from improper influence. [Citation.]  Although the presence of a third party impinges on the privacy and secrecy of deliberations, reversal is not warranted if no harm resulted from the intrusion." *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 17; see *United States v. Olano*, 507 U.S. 725, 737-41 (1993) (mere presence, but not participation, of alternate jurors during jury deliberations warrants reversal only if the defendant suffers prejudice as a result of the intrusion; but "[t]here may be cases where an intrusion should be presumed prejudicial").  In the context of replaying videotaped *testimony*, it has been noted that doing so might lead the jury to overemphasize that testimony.  75B Am. Jur. 2d *Trial* § 1390 (2019).  Thus, courts have held that videotaped testimony should be replayed in open court, under the trial court's supervision, and with the defendant and counsel present. *Id.*

¶ 138   In Illinois, authority is currently split as to whether it is error for a trial judge to have the jury view, during deliberations*, nontestimonial* video evidence in the courtroom, with the judge, counsel, and the defendant present.  The First, Fourth, and Fifth Districts (and earlier Third District cases) have concluded that it does not constitute reversible error. *People v. Ryder*, 2019 IL App (5th) 160027, ¶¶ 47-51 (in *dicta*); *People v. Lewis*, 2019 IL App (4th) 150637-B, ¶¶ 87, 95; *People v. McKinley*, 2017 IL App (3d) 140752, ¶¶ 14, 22; *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 20; *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 78.  The Third District has more recently concluded that such a procedure constitutes second-prong plain error. *People v.*

*Hollahan*, 2019 IL App (3d) 150556, ¶¶ 20, 29; *People v. Henderson*, 2017 IL App (3d) 150550, ¶¶ 46, 48. We turn to review the case law.

¶ 139 In *Rouse*, 2014 IL App (1st) 121462, technical difficulties prevented playing a surveillance video in the jury room during a murder case. The reviewing court held that the trial court did not abuse its discretion in allowing the jury, with proper limiting instructions, to view the video in the courtroom rather than in the jury room, before the judge and the parties. *Id.* ¶ 78. Further, the reviewing court noted that the trial court played only the portions of the video that the jury had requested, but it also informed the jurors that they could view the recording *as often as they wished* and cautioned them not to engage in deliberations or discussions in the courtroom. *Id.* No one communicated with the jury while the video was played. *Id.* ¶ 79. The reviewing court commented that the better approach would have been for the jurors to view the video in the jury room, on a laptop (which also happened to contain other material), but with instructions not to use the laptop for any purpose other than to view the video and to return it once they were done. *Id.* ¶¶ 80-82.

¶ 140 In *Johnson*, 2015 IL App (3d) 130610, the reviewing court concluded that there was no abuse of discretion and held that the defendant, who had been convicted of aggravated battery of a peace officer, failed to establish prejudice when the trial court allowed the jury to review a surveillance video in the courtroom before the judge, counsel, and the defendant. *Id.* ¶ 20. There was no video equipment readily available for use in the jury room. *Id.* The reviewing court determined that allowing the jurors to view the video in the courtroom demonstrated that the trial court properly determined that the additional viewing was probative and not unduly prejudicial. *Id.* ¶ 15. It held that there was no prejudice, where the viewing showed no intent to influence the jury's decision. *Id.* ¶ 20. The trial court admonished the parties that they would not be allowed

to communicate with the jury during the courtroom viewing, and neither the prosecutor nor defense counsel attempted to do so. *Id.* The reviewing court rejected the defendant's argument that the video evidence was favorable to him and that he would have been acquitted if the jury had been allowed to view the video in the jury room. *Id.* ¶ 21. It noted that the video was introduced by the State as evidence of the defendant's guilt and that the video corroborated the officers' testimony. Thus, the court could not assume that viewing it again in the jury room would have led to a different result. *Id.*

¶ 141 The dissenting justice would have held that the viewing of the video in the judge's and the parties' presence exerted a chilling effect on the jury's deliberations and its verdict. *Id.* ¶ 54 (McDade, P.J., dissenting). The presence of the judge, the defendant, and the attorneys, the dissent argued, was intrusive, and the controlled environment prevented free discussion by the jurors and did not allow them to control the video. *Id.* ¶¶ 49-56.

¶ 142 In *McKinley*, 2017 IL App (3d) 140752, an aggravated DUI case, the defendant argued that during deliberations the trial court erred in allowing the jury to view a video of his traffic stop and field sobriety tests in the courtroom, rather than in the jury room, in the presence of the substitute judge, the prosecutor, the defendant, defense counsel, and the bailiff. (The reviewing court did not note if there were technical issues that precluded playing the video in the jury room.) Reviewing the issue for plain error, the court affirmed the defendant's conviction, holding that the viewing was not prejudicial to the defendant where the record did not reflect that the presence of the defendant, the attorneys, and the substitute judge affected the jurors in any way. *Id.* ¶ 14 (opinion of Carter, J.). No one present in the courtroom spoke to the jury while the video was played, and the trial court instructed the jurors that, if they had any further questions, they could provide them to the bailiff. *Id.* 23. In the absence of prejudice, there can be no abuse

of discretion. *Id.* ¶ 22. Further, the reviewing court noted that the mode and manner in which a trial court allows a jury to view evidence falls within the scope of the court's inherent authority to manage its courtroom. *Id.* However, the *McKinley* court cautioned that the trial court's procedure "could have the potential of becoming problematic and possibly lead to prejudicial error in some cases." *Id.* The court next rejected the defendant's argument that it would have benefitted him if the jurors had been allowed to pause and replay portions of the video. *Id.* ¶ 24. The court noted that the video clearly showed, consistent with the officers' testimony, that the defendant did not properly complete the field sobriety tests and, thus, that viewing the video in the jury room would not have resulted in a different verdict. *Id.* Finally, even if there was error, there was no plain error, because the evidence was not closely balanced and the error was not a structural error, because it did not affect the fairness of the trial or challenge the integrity of the judicial process. *Id.* ¶¶ 25-27.

¶ 143   The specially concurring justice would have held that the trial court erred in allowing anyone to be present with the jury when it viewed the video, but she agreed with the alternative holding that any error was not plain error. *Id.* ¶¶ 32, 36 (O'Brien, J., specially concurring). The dissenting justice would have concluded that, although allowing jurors to view evidence in outsiders' presence is not necessarily error in every case, the instant case warranted finding error. *Id.* ¶ 38 (Holdridge, P.J., dissenting). He concluded that the trial court's instructions were erroneous in that they lacked specificity and were confusing. *Id.* ¶ 41. The trial court had instructed the jurors that no one could make comments about the video, that they could make whatever observations they chose to make, and that there would be no questioning of any of the attorneys. *Id.* ¶ 40. The dissenting justice would have concluded that a reasonable juror would not have known if they were allowed to discuss the video in the jury room. *Id.* ¶ 41. The

instructions, coupled with the presence of the judge, the parties, and the bailiff, chilled the jury's deliberations and prejudice should have been presumed. *Id.* ¶¶ 41-42. Thus, a clear error occurred. *Id.* ¶ 44.

¶ 144 In *Henderson*, 2017 IL App (3d) 150550, a murder case, the trial court twice allowed the jurors to review video and audio evidence in the courtroom during their deliberations, but in the presence of only an employee of the prosecutor's office and the bailiff. The trial court had instructed the jurors not to discuss the case while the prosecutor's office employee was in the room. The reviewing court, reviewing for plain error, held that the trial court erred in allowing the jury to review the video and audio evidence while the prosecutor's office employee was present but neither the judge, defense counsel, nor the defendant was present to oversee the interaction and observe any impropriety. *Id.* ¶ 46. The court also concluded that the error was a structural error, because allowing the employee to be in the room when the jury reviewed the evidence, without prior notice to the defendant, rendered the trial fundamentally unfair and eroded the integrity of the judicial process. *Id.* ¶ 48.

¶ 145 In *Lewis*, 2019 IL App (4th) 150637-B, the reviewing court held that the trial court did not err (and thus there was no structural error) in playing, during deliberations, a 911 recording in the courtroom with the trial judge, the defendant, and the attorneys present. *Id.* ¶¶ 87, 95. Technical issues had precluded playing the recording in the jury room. The reviewing court rejected the Third District's analysis in *McKinley*, and it adhered to its view in an earlier case that allowing a jury to view a video in the courtroom during deliberations did not amount to a structural error. *Id.* ¶ 95 (citing *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 43); see also *Matthews*, 2017 IL App (4th) 150911, ¶ 44 (citing *McKinley*, 2017 IL App (3d) 140752, ¶¶ 27, 36, and declining to conclude there was structural error; further noting that a declaration that

there was structural error was "best left to our supreme court")); *Ryder*, 2019 IL App (5th) 160027, ¶¶ 47-51 (replay, in presence of a bailiff and a clerk, of investigator's interview with the defendant held not an abuse of discretion; further holding that, *even if* allowing jury to view evidence in the presence of neutral nonjurors *or the parties* were error, it does not constitute second-prong plain error).[1]

¶ 146    The *Lewis* court further noted that a trial court may exercise its discretion by bringing the jury into the courtroom to replay a recording; it need not send the recording into the jury room. *Lewis*, 2019 IL App (4th) 150637-B, ¶¶ 97, 99 (citing foreign cases noting this as the majority rule).    The court stated that this process avoids problems with operating the equipment.    *Id.* ¶ 97. It also noted that, when the jury returns to the courtroom and listens silently to the recording, it is doing the same thing it did during the trial.    *Id.* ¶ 98.    However, if the trial court replays the recording in the courtroom, "*the court, parties, and counsel must be present to view or hear the evidence*, and the court should instruct the jury not to discuss the evidence while in the courtroom."    (Emphasis added.)    *Id.* ¶ 99.    Also, in the jury's presence, the trial court should admonish everyone else to be silent and not to communicate with or try to influence the jury.    *Id.* After the viewing, it should instruct the jury to continue its deliberations, which may include the replay.    *Id.*    Although the trial court in *Lewis* did not give these admonishments and instructions, the reviewing court concluded that there was nothing in the record that showed prejudice or any impropriety during the replay of the recording.    *Id.* ¶ 100.

¶ 147    More recently, the Third District thoroughly explained the rationale for finding a courtroom viewing presumptively prejudicial and a structural error.    In *Hollahan*, 2019 IL App

_____

[1] The Fifth District's statement that there is no structural error if the replay occurs in the *parties'* presence is *dicta*, because in that case the parties were *not* present during the replay.

(3d) 150556, an aggravated DUI case, the jurors were shown a video in the courtroom, because the court did not have the " 'arrangement' " necessary to allow the jurors to view it in the jury room. *Id.* ¶ 10. The trial court also allowed the defendant, the attorneys, and two alternate jurors to remain in the courtroom while the jury watched the video, and the trial court admonished them that no conversations could occur while the jury watched the video. The trial court instructed the jurors that no one would be speaking to them, that no one was to say a word, and that, if the sound needed to be adjusted "or anything," that would be done. Reviewing for plain error, the Third District reversed and remanded, holding that the trial court erred by having the jurors watch the video in the courtroom with the prosecutor, the defendant, and defense counsel present and, further, that the error constituted a structural error. *Id.* ¶¶ 20, 29. The third parties' presence during deliberations "clearly inhibited" the jurors' deliberations "and restrained their freedom of expression and action." *Id.* ¶ 21. Each of the nonjurors in the courtroom had "a direct interest in the outcome of the litigation," and their presence was "inherently intimidating" to the jurors, who "almost certainly" would have been inhibited in their deliberations while the video was played. *Id.* Further, the trial court's statements to the jury removed any reasonable doubt on the question, where the court conveyed that no one, including the jurors, could speak while the video was played and that they could not control the playing of the video, pause it or replay any parts that they wanted to view in detail, or discuss it. *Id.* ¶ 22. The trial court "effectively precluded the jurors from engaging in any deliberations while the video was being shown and likely limited their ability to focus sufficiently on the particular portions of the video that gave them concern." *Id.*

¶ 148    The reviewing court disagreed with case law that declined to find reversible error under similar circumstances and that relied on the facts that the third parties in the courtroom were

instructed not to communicate with the jurors (and did not attempt to do so) and that the jurors returned to the jury room afterward for unfettered deliberations. *Id.* ¶ 23 (citing *Lewis*, *Johnson*, and *Rouse*). The court noted that these facts did not mitigate the prejudicial impact on the deliberations that occurred while the jurors viewed the video. *Id.* The jurors could not discuss the video as they were viewing it or pause or replay any portions of it that they found important. *Id.* Thus, in each case, the trial court's procedure

> "directly impeded the jury's deliberations. The mere fact that the jury could have discussed the video later in the jury room is immaterial. In each case, the jury was prevented from controlling the video, from freely discussing it, and from debating any issues relating to the video while they were watching it." *Id.*

The Third District also disagreed with opposing case law because those cases did not acknowledge that the mere presence of the third parties in the courtroom improperly intruded on the privacy of the jury's deliberations, with an inherently intimidating and inhibiting effect upon them. *Id.* ¶ 24. This should be deemed, the court noted, presumptively prejudicial. *Id.* ¶ 24 n.3 (distinguishing *Olano* and noting that alternate jurors were disinterested parties, whereas the parties and counsel had a direct interest in the outcome of the case and the trial judge was an "authoritative, intimidating figure who was not a finder of fact and did not share the same standing as the jurors"). Criticizing cases that ruled that a courtroom viewing during deliberations is no different from the initial viewing during the trial, the court deemed the contexts "critically different" and noted that, unlike public trials, deliberations must be private and secret. *Id.* ¶ 25. The court also noted that jurors must be shielded from outside influences. *Id.*

¶ 149   The *Hollahan* court also noted that, although a trial court has discretion to determine whether to grant a jury's request to view evidence and the mode and manner in which the jury views the evidence, the court abuses its discretion and commits reversible error if it allows the jury to view that evidence in a manner that improperly inhibits the jury's deliberations. *Id.* ¶ 26. The court also addressed the technical aspects of viewing a recording, stating that it was "difficult to believe" and "inexplicable" that technical issues would frequently preclude arranging for a jury to review video or audio evidence in the jury room without risking its destruction or other technical difficulties. *Id.* ¶ 27. However, even if a recording must be played in the courtroom, the court determined, the jury should view it in private, not in the presence of third parties. *Id.* ¶ 28. The jury's mere presence in the courtroom does not transform the activity into a court proceeding requiring the presence of the judge and the parties. *Id.* "The parties have no right to be present for such deliberations, regardless of where they occur. *** Nor does it entitle the defendant or any other third party to be present during those deliberations." *Id.*

¶ 150   The Third District also held that the trial court's procedure was structural error and, thus, reversible under the plain-error doctrine. *Id.* ¶ 29. The court noted that the presence of the third parties "was inherently intimidating and necessarily impeded or inhibited the jurors' free discussion and deliberation as the video was being shown to them." *Id.* ¶ 29. This was exacerbated by the trial court's statement that they were not free to speak while it was played. This rendered the trial "an unreliable means of determining guilt or innocence," and the reviewing court declined to follow case law holding or suggesting otherwise. *Id.*

¶ 151   Addressing the dissent's comment that there is reversible error only if the defendant is prejudiced by an intrusion into a jury's deliberations, the majority disagreed with the dissent's assumption that prejudice could be established only by showing either that a third party engaged

in prejudicial communication with a juror or that improper extraneous information reached the jury. *Id.* ¶ 30. In the majority's view, the *mere presence* of third parties during deliberations "improperly intrudes upon the privacy of jury deliberations and has an inherently intimidating and inhibiting effect upon such deliberations." *Id.* Their presence "should be deemed *presumptively prejudicial* [citation], regardless of whether they involve any express communications or the transmission of 'extraneous information.' " (Emphasis added.) *Id.* The majority further noted that the prejudice created by the third parties' presence during deliberations was *compounded in the case before it by the trial court* precluding the jury from controlling the video, commenting on it, or deliberating while watching it. Thus, its deliberations were impeded on a matter of obvious concern to it and prejudiced the defendant. *Id.*

¶ 152 The dissenting justice would have held that the defendant failed to show any error or thus any plain error. *Id.* ¶ 37 (Carter, J., dissenting). He analogized to the law regarding impeachment of a jury verdict, which states that "a rebuttable presumption of prejudice arises when a defendant shows that a third party has communicated with a juror about a matter pending before the jury or that the jury has been exposed to improper extraneous information that relates directly to something at issue in the case that may have influenced the verdict." *Id.* ¶¶ 39-40. The dissenting justice noted that allegations that a juror " 'may have been exposed to extraneous information of an unknown nature' " are insufficient to raise a presumption of prejudice. *Id.* ¶ 40. In the case at hand, the dissenting justice noted, the defendant had not shown that any of the third parties engaged in prejudicial communication with the jury about a matter pending before it or that improper extraneous information reached the jury. *Id.* ¶ 41. "The mere possibility of an improper communication," which is all that the defendant had shown, was insufficient to

establish prejudice. *Id.* The dissenting justice would not have found an abuse of discretion and, further, he commented, "With all due respect, I believe that the majority's position on this issue is a radical departure from the traditional way reviewing courts have treated questions involving the integrity of jury deliberations." *Id.*

¶ 153                                  1. Whether Error Occurred

¶ 154   Regarding defendant's first claim of error—that the trial court erred in restricting the jury to one silent viewing of the video in open court—he argues that fundamental principles of our justice system were violated. The presence of third parties, defendant asserts, significantly disrupted the deliberations, and the silence imposed on the jurors exerted a chilling effect because they could not discuss the video while it played. Further, the court's exclusive control of the video deprived the jurors of the opportunity to pause or replay key parts of it as they deliberated. Thus, restricting the jury to one silent viewing in open court was error.

¶ 155   Defendant also argues that, unlike in *McKinley* and *Johnson*, where the courts determined that the juries' uninhibited review of the video evidence would not have been helpful to the defendants (because the videos were consistent with the State's witnesses' testimony), the same cannot be said here. According to defendant, the video in this case was of poor quality and necessitated the jury's close, unimpeded view. The video depicted many things happening, but the view was obstructed by snow or ice and the video had no sound. Also, defendant notes that the events depicted formed the basis of a number of discrete charges: an alleged drug transaction, defendant's driving away from the scene, the attempted murder of one officer, and the battery of three other officers. In contrast to the videos at issue in the case law, he argues, the video here required that the jury be able to control its playback and discuss the events while they unfolded on the video. That the jury could discuss the video in the jury room afterward was no substitute

for being able to deliberate openly and freely while watching the video. Further, defendant notes that a laptop was available, which the jury requested to view the video, and that the court could have instructed the jurors not to use it for any improper purposes, such as research. Instead, the court chose a manner that deprived him of his right to a fair and impartial jury.

¶ 156 Defendant's second claim of error is that restricting the jury to a single viewing of the video was improper and prejudicial. He argues that the jury was entitled to replay the choppy video, pause it, and discuss its contents as it saw fit. It was key evidence, in his view, and the court's refusal to allow the jury to view it more than once was unquestionably prejudicial, because the court itself *overturned* part of the jury's verdict after it *repeatedly* viewed *both* versions of the video. Thus, the court itself found it useful to view both versions of the video and to view them multiple times. Had the jury been able to view the video multiple times, defendant contends, it might have acquitted him of attempted murder and other counts. The court's restriction was, thus, improper and prejudicial. Further, as defendant notes, though the court noted that the time on the video was not accurate and it admonished the jury not to use it to "count seconds," the court itself found that the video showed defendant driving backward and forward for, at most, a few seconds.[2]

¶ 157 Defendant's third and final claim of error is that the trial court erred in admonishing the jury about how much weight to give to the video, specifically stating that the jury should not "over-emphasize" that exhibit over other evidence. Defendant asserts that the court's comments violated the jury's exclusive right to decide how much weight to give the evidence. See, *e.g.*,

---

[2] In ruling on defendant's posttrial motion, the court commented, "While the video time counter may be inaccurate to the entire incident, from the backing up, to the leaving, to the leaving down the berm is at most a very few seconds."

*People v. Collins*, 106 Ill. 2d 237, 261-62 (1985) (determinations of credibility and weight to give to the testimony of witnesses are exclusively within the province of the trier of fact). The jury was entitled, he notes, to give the video whatever weight or emphasis that it determined was merited. When the trial court instead informed the jury that it should not emphasize the video over other evidence, this effectively discouraged the jury's reliance on it. Furthermore, defendant notes, most of the other exhibits were sent to the jury room and the court could not control how many times the jury reviewed those exhibits. The court's admonishments were particularly misguided, according to defendant, because video recordings can present an objective view of a case. The jury alone, he urges, was entitled to decide the significance of the video when reaching its verdict. The court's comments here, given its great influence over the jury, likely diminished the value of the video in the jurors' minds.

¶ 158   Finally, defendant maintains that he suffered prejudice from the court's restrictions on the jury's viewing of the video and from the court's erroneous admonishments regarding the weight to be given to that evidence. The video was critical evidence to both sides at trial, and it related to each of the counts. It depicted part of the alleged narcotics transaction and showed defendant's departure from the scene, which was the basis of the charges of attempted first-degree murder, aggravated battery, and aggravated fleeing. Also, unlike in *McKinley* and *Johnson*, the video was of poor quality and the lens was partly obstructed. In order to reach decisions on the various charges, the jury had to consider the actions of multiple people and vehicles that were moving at the same time. Also, unlike in the case law, the video did not unequivocally support the testimony of the State's witnesses. He points to the fact that the video does not show Stankowitz placing his hands on the hood of the Cadillac, as he had stated in his testimony, or the Cadillac striking the blue minivan or Cabrales. Finally, defendant argues that

the most telling indication of prejudice is that the court expressly relied on the video when overturning part of the jury's verdict, finding that defendant lacked the requisite specific intent to kill Stankowitz. Had the jury been permitted to have the video in the jury room, defendant asserts, it might have acquitted him on this count and other charges.

¶ 159    The State responds that the majority of the case law is not in defendant's favor and that, here, there was no attempt to influence the jury or any resulting prejudice. The State notes that neither the State nor defendant attempted to communicate with the jurors. Further, the trial court merely relayed the reviewing procedure to the jurors and noted that, if the video were sent to the jury room, the jurors could view it "a thousand times" and there was no other evidence that could be viewed that way. The court also properly advised that no single piece of evidence should be overemphasized.

¶ 160    We conclude that there was error in the trial court's limiting the jury's access to the video during deliberations. As noted, the circumstances here are unlike those in the cases we discussed above. First, this case does not involve technical issues with replaying the video. Second (and the critical distinction), none of the cases involved a video that undisputedly lacked clear images and did not play in real time. Given the qualitative limitations of the video in this case, we conclude that the court abused its discretion in limiting access to the video. *Cf. Rouse*, 2014 IL App (1st) 121462, ¶¶ 78-82 (although the better approach would have been to allow the jury to view the video in the jury room, no abuse of discretion where technical difficulties prohibited doing so and the trial court admonished the jurors that they could view the video as many times as they wished in the courtroom in the presence of third parties). We find support for our conclusion in the court's comments, in its ruling on defendant's posttrial motion, that it viewed *both* versions of the video *several* times before it determined that the evidence (including

Stankowitz's testimony, which it discounted in light of the video) was not sufficient to sustain the attempted-murder verdicts. In addressing its analysis of the attempted-murder charges, the court commented:

> "The video itself is choppy when viewing this particular situation. *I viewed it several times, both videos*, to get a very good—to try to see what information I could glean from the admitted videos; and, again, the time lapse on the trial counter was not accurate as to the time, so that was not helpful. And, again, the video is somewhat choppy. I did see an officer there. I did see, I think it was, an officer, a person move a step or so backwards from the car before the car went down the embankment." (Emphasis added.)

¶ 161 It is troubling that, in assessing the jury's request for the video, the court ignored the video's poor quality and the limitations it presented. As confirmed by the court's posttrial comments and our own viewing of the video, it is difficult to ascertain the events depicted. Thus, the only reasonable approach would have been to allow unrestricted access.

¶ 162 We also agree with defendant that some of the court's admonishments to the jury were an abuse of discretion and prejudicial. The court instructed the jury:

> "Let me explain a little bit, just so you understand, and the reason I am doing it this way is because in my experience, *if you send the video back there, that it could be viewed a thousand times*. Now, there is no other evidence that you are going to view a thousand times, just that evidence. That's—there is no other evidence you are going to view twice like you are the video in this matter or this particular video.
>
> *I don't think it's fair to the parties to overemphasize one piece of evidence over any other piece of evidence.* That's how this thing gets played out.

> If you asked me if could [*sic*] bring some other witnesses and put them back on the stand, see, we couldn't do that. We can't do—you can't be given that more than one—more than the time that they are allowed to you, so we will do it once. *I understand that it's significant. I find it's fair. We can do it one time*.
>
> It's not fair for any lawyers to say anything or the defendant to say anything. We are just going to view it in silence. When we are done, we will send you back to the jury room to further your deliberations." (Emphases added.)

¶ 163 We conclude that the trial court's comments violated the jury's exclusive right to decide how much weight to give the video. "The right to a trial by jury is a fundamental right guaranteed by our federal and state constitutions." See, *e.g.*, *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). It was highly improper for the court to comment or opine on how much emphasis the jury should place on the video and to note that it was "significant," because the comments interfered with the jury's exclusive fact finding role. Furthermore, it was the jury's prerogative to look at the video as many times as it wished.

¶ 164 We agree with defendant that prejudice was shown here, where the jury convicted defendant of attempted murder, convictions that the trial court, upon further multiple viewings of *both* versions of the video, reversed for lack of sufficient evidence. The video was, thus, clearly critical evidence. As defendant notes, although the video shows the Cadillac traveling in reverse toward the blue minivan, it does not show it hitting Cabrales.

¶ 165 Finally, we wish to comment on *Hollahan*. That opinion reflects the Third District's evolution on the issue of courtroom video replays. Although we take no position on its holding, we believe that *Hollahan* makes a compelling case that courtroom replays in the presence of third parties are, in themselves, inherently prejudicial and inhibit the jury's deliberations.

Although the case before us presents *additional* circumstances that warrant finding error, we acknowledge that the issues that *Hollahan* raises—such as the recurrence of technical issues, the distinction between a live trial (where all parties are present) and jury deliberations (which are limited only to jurors), and the jury's lack of control over the replay (which, the *Hollahan* court compellingly argues, inherently inhibits deliberations)—warrant further consideration of the mode and manner in which a jury is given access to evidence in this state. We need not decide whether all courtroom replays in the presence of third parties are inherently prejudicial, because, again, this case presents unique and egregious circumstances.

¶ 166                           2. Second-Prong Plain Error

¶ 167   Having determined that there was error in the manner in which the trial court played the video for the jury during deliberations, we turn next to the second prong of plain-error review.

¶ 168   Defendant argues that the trial court's limitations on the jury's viewing of the video were clear and obvious error and that, under the second prong of plain-error review, the error was so grave that it undermined the fairness of his trial and challenged the integrity of the judicial process. Defendant argues that the trial court intruded upon the privacy and secrecy of jury deliberations by requiring the jury to view the video silently, in open court, and in the presence of the judge, the parties, and any spectators. *Hollahan*, 2019 IL App (3d) 150556, ¶ 29; see also *McKinley*, 2017 IL App (3d) 140752, ¶ 35 (O'Brien, J., specially concurring); *id.* ¶ 44 (Holdridge, P.J., dissenting); *Johnson*, 2015 IL App (3d) 130610, ¶ 49 (McDade, P.J., dissenting). Moreover, defendant contends, the court further erred by curtailing the jury's evaluation of the video by allowing only a single viewing and then admonishing the jury that repeated viewings would be unnecessary—even though the court itself viewed the video multiple times and relied on it in overturning part of the jury's verdict. The error here, defendant urges,

was far more egregious than any error in *McKinley* and *Johnson*, where the courts did not find plain error. Here, the error invaded the secrecy of deliberations and the jury's evaluation of key evidence. Because the court's ruling fundamentally deprived defendant of a fair trial, he argues, the error warrant review under the second prong of plain error.

¶ 169   An error is generally considered structural when it renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence. *People v. Glasper*, 234 Ill. 2d 173, 196 (2009). The United States Supreme Court has found structural error in a limited class of cases, including those involving complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable-doubt instruction. *People v. Thompson*, 238 Ill. 2d 598, 609 (2010) (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). Our supreme court has noted that plain error is not restricted to the types of structural errors recognized by the Supreme Court. It has held that the failure to apply the one-act, one-crime rule and the failure to exercise discretion in denying a request for a continuance constituted second-prong plain error. See *People v. Clark*, 2016 IL 118845, ¶ 25 (citing cases).

¶ 170   Having concluded that error occurred here, we further hold that there was second-prong plain error. The failure to allow for proper jury deliberations, and the resulting prejudice, was clearly serious, undermined the fairness of defendant's trial, and challenged the integrity of the judicial process. *Hollahan*, 2019 IL App (3d) 150556, ¶ 29; *Henderson*, 2017 IL App (3d) 150550, ¶ 48. In any event, in *Olano*, the Supreme Court noted that "[t]here may be cases where an intrusion should be presumed prejudicial." *Olano*, 507 U.S. at 739. This case presents such a scenario. The video's poor quality required that the jury be given at least some control over the replay, and the trial court's admonishment not to overemphasize the video invaded the jury's

exclusive factfinding role (see *Bracey*, 213 Ill. 2d at 269).  Under the unique facts of this case, the mode and manner in which the video was replayed, coupled with the trial court's comments touching upon the weight to be given the evidence, intruded upon the jury's review and evaluation of key evidence and the error was so egregious as to constitute second-prong plain error.

¶ 171                                  B. Police Uniform

¶ 172   Next, defendant argues that his conviction of aggravated fleeing or attempting to elude a peace officer should be reversed because the State failed to prove the essential element that the officer was wearing a "police uniform."  625 ILCS 5/11-204(a) (West 2012).  For the following reasons, we reject his argument.

¶ 173   In a challenge to the sufficiency of evidence, a reviewing court will not substitute its judgment for that of the trier of fact and will not reverse a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).  "Reasonable doubt exists as a matter of law when the State fails to prove an essential element of the offense."  *People v. Fountain*, 2011 IL App (1st) 083459-B, ¶ 13.

¶ 174   Further, in resolving an issue of statutory construction, the court's objective involves ascertaining and carrying out the "true intent and meaning of the legislature evidenced by the language used."  *Langendorf v. City of Urbana*, 197 Ill. 2d 100, 109 (2001).  Indeed, our inquiry "always begin[s] with the language of the statute, which is the surest and most reliable indicator of legislative intent."  *People v. Pullen*, 192 Ill. 2d 36, 42 (2000).  We give undefined statutory words and phrases their natural and ordinary meanings.  *Id.*  And we enforce the clear and unambiguous language as written, without resort to other aids of construction, *e.g.*, legislative

history. *People v. Fitzpatrick*, 158 Ill. 2d 360, 364-65 (1994). The construction of a statute is a question of law, which we review *de novo*. *People v. Starks*, 2019 IL App (2d) 160871, ¶ 26.

¶ 175   Here, the State needed to prove that defendant was a "driver or operator of a motor vehicle who, having been given a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to a stop, wilfully \*\*\* fle[d] or attempt[ed] to elude the officer" (625 ILCS 5/11-204(a) (West 2012)) "and such flight or attempt to elude \*\*\* cause[d] bodily injury to any individual" (*id.* § 11-204.1(a)(2)). Further, "[t]he signal given by the peace officer may be by hand, voice, siren, [or] red or blue light. Provided, *the officer giving such signal shall be in police uniform*[.]" (Emphasis added.) *Id.* § 11-204(a).

¶ 176   The statute has been strictly construed. See *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶¶ 120-21 (reversing conviction where evidence did not show what the officers were wearing at the time of the stop); *People v. Williams*, 2015 IL App (1st) 133582, ¶¶ 14, 16 (because statute requires pursuing officer be in police uniform, reversing conviction where officer testified that he wore " ' civilian dress' " and noting operative concern "is not whether [the defendant] knew the police were following him; but rather, whether the requirements of the statute have been met"); *People v. Murdock*, 321 Ill. App. 3d 175, 176 (2001) (reversing conviction where no evidence was presented concerning the officer's clothing and rejecting argument that the defendant should have known pursuer was a police officer because lights and siren were activated).

¶ 177   Here, defendant contends that none of the officers who first approached him in the McDonald's parking lot wore police uniforms. Carrillo, Gonzales, Selvik, and Lizotte were acting undercover and, thus, wore plainclothes. Lizotte testified that he wore a shirt, tie, and jacket and a badge on his belt. Defendant further notes that the four officers on the primary arrest team—Schuldt, Stankowitz, Murphy, and Bognetti—were dressed similarly in jeans and

police vests. The three officers who arrived in the blue minivan—Cabrales, Murray, and Ostrem—also did not wear police uniforms, defendant argues. Cabrales stated that he wore a black shirt, a life vest—both of which had the word "police" written on them—jeans, a beanie cap, a badge, and a police lanyard with his ID.

¶ 178 The vests with police markings, defendant believes, did not transform the officers' attire into uniforms. Wearing a police vest over civilian clothing, in his view, did not demonstrate the distinctive or characteristic design of police uniforms. Further, even if defendant knew that the people ordering him to stop were officers, his knowledge was irrelevant because the statute's plain language mandates that the officer giving the signal to stop be in a police uniform. He also notes that in closing argument the State did not identify any evidence that the officers wore police uniforms. Thus, defendant argues, his conviction should be reversed.

¶ 179 In response, the State argues that the term "police uniform" logically includes vests and other such clothing that are clearly labeled with the word "police," as well as badges, police radios, police stars, and police-issued gun belts, which civilians would not be wearing. It also contends that not all officers wear patrol-type uniforms while working.

¶ 180 Defendant replies that tactical vests and assorted clothing with "police" written on them do not amount to the type of distinctive or characteristic clothing worn by police officers on a day-to-day basis. Instead, the officers' tactical clothing and accessories were worn for the purpose of an undercover reverse-buy drug operation. Also, the statute, defendant notes, is distinct from others that merely require that the defendant knew that the person was a police officer. See *People v. Ruiz*, 312 Ill. App. 3d 49, 57-58 (2000) (affirming conviction of attempted murder of a police officer where the defendant "knew or should have known" that people

pursuing him after a bank robbery were police officers, as evidenced, in part, by his statement following the pursuit that "these cops [are] trying to kill me").

¶ 181   We conclude that a vest with police markings can, under certain circumstances, constitute a police uniform under the statute and that the totality of the evidence here was sufficient to establish this element of the offense.  We reject defendant's argument that only a traditional police uniform satisfies the statutory requirement in all circumstances.  The statute includes this requirement because it ensures that the defendant is fleeing or eluding an actual police officer. *Cf.  People v. Hansen*, 2019 IL App (3d) 170302, ¶ 14 ("purpose of requiring use of a vehicle's 'illuminated oscillating, rotating or flashing red or blue lights' with a siren is so that they 'would indicate the vehicle to be an official police vehicle' ").

¶ 182   Given our reading of the statute and the factual circumstances here, we conclude that the evidence was sufficient to sustain defendant's conviction.  As relevant here, Stankowitz was the only nonundercover officer in defendant's range of vision (he testified that he made eye contact with defendant) who gave defendant a signal to stop his car.  He stated that he wore a sweater, a black tactical vest with police markings on the front and back, and a badge around his neck.  He also had a firearm on his right hip.  Thus, with the evidence viewed in the light most favorable to the State, defendant saw an individual wearing a vest with police markings, wearing a badge around his neck, announcing "police" to defendant, and ordering him to stop.  The foregoing occurred in daylight, in a public place, and with civilians present.  The only reasonable inference, in our view, is that Stankowitz was a peace officer in a police uniform.

¶ 183   In summary, a vest with police markings can, under certain circumstances, constitute a police uniform under the statute and, here, there was sufficient evidence on this element to sustain defendant's conviction.

¶ 184                              III. CONCLUSION

¶ 185   For the reasons stated, the judgment of the circuit court of Kane County is reversed and the cause is remanded for a new trial.

¶ 186   Reversed and remanded.