2023 IL App (2d) 230067
No. 2-23-0067
Opinion filed December 21, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-395 |
| KRYSTLE L. HOFFMAN, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Mullen concurred in the judgment and opinion.
Justice Jorgensen specially concurred, with opinion.

**OPINION**

¶ 1    Defendant, Krystle L. Hoffman, was arrested for committing a drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2018)). Three days after her arrest, defendant's father posted $5000 in bond. Defendant continued to work while out on bond. Four years after she was arrested, defendant pleaded guilty to committing a drug-induced homicide. No agreement was made concerning her sentence. Defendant filed an election to be sentenced under section 5-4-1(c-1.5) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5-4-1(c-1.5) (West 2022)), which permits trial courts to exercise their discretion and impose sentences below the mandatory minimums if certain conditions were met. Following a hearing, the trial court sentenced defendant to six years'

imprisonment, the mandatory minimum sentence. See 720 ILCS 5/9-3.3(b) (West 2018) (drug-induced homicide is a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2018) (sentence for Class X felony is between 6 and 30 years). The court did not impose a sentence under section 5-4-1(c-1.5) of the Corrections Code because it found that provision inapplicable to drug-induced homicide. The court also ordered defendant to pay $4492.64 in restitution to the father of the victim, Lorna Haseltine. Because part of defendant's bond was exonerated, the bond did not completely satisfy the restitution amount. The court set June 30, 2023—6 months and 11 days after the sentencing order was entered—as the date for defendant to pay restitution. Defendant moved the court to reconsider her sentence, challenging only the court's decision not to impose a sentence under section 5-4-1(c-1.5) of the Corrections Code. The court denied the motion, and this timely appeal followed. On appeal, defendant argues that we must vacate her six-year sentence and the restitution order and remand this cause for a new sentencing hearing because (1) section 5-4-1(c-1.5) of the Corrections Code applies to drug-induced homicide and (2) the trial court failed to set the manner and method of paying restitution in light of defendant's ability to pay. We vacate defendant's six-year sentence and remand for the trial court to (1) consider imposing a sentence under section 5-4-1(c-1.5) and (2) set the manner and method of paying restitution in light of defendant's ability to pay.

¶ 2                                    I. BACKGROUND

¶ 3    On November 16, 2018, defendant was charged by information with drug-induced homicide. The next day, the trial court's staff prepared a pretrial bond report and defendant prepared an affidavit of assets and liabilities. The pretrial bond report indicated that defendant worked as a manager at TGI Fridays, had worked there for the last 15 years, and earned between $3000 and $4000 per month. The affidavit of assets and liabilities revealed that defendant worked

as an "assoc. manager/server" at TGI Fridays, earned $2300 a month, and paid $1035 in rent and $300 toward a car loan.[1] The court set defendant's bond at $50,000, with 10% to apply. Defendant's father posted $5000 in bond on November 19, 2018. He signed the bail bond, acknowledging that "any and all of the bail bond deposited may be used to pay costs, attorney's fees, fines, restitution, or for other purposes authorized by the Court." Nine days after posting bond, defendant retained private counsel to represent her.

¶ 4    Approximately two months later, in January 2019, defendant was indicted. The bill of indictment provided:

"That on or about August 12, 2017, *** [defendant] committed the offense of DRUG-INDUCED HOMICIDE, *** in that said defendant, while committing a violation of the Controlled Substances Act, Section 40l(d) of Act 570 of Chapter 720 of the Illinois Compiled Statutes [(720 ILCS 570/401(d) (West 2018))], unlawfully delivered heroin, a controlled substance, containing fentanyl, to *** Haseltine, and *** Haseltine['s] death was caused by the injection, inhalation, absorption, or ingestion of that controlled substance."

¶ 5    In February 2020, approximately one year after she was indicted, defendant submitted a change of address form. This form reflected that she was moving from an apartment in Joliet to an apartment in Bolingbrook. In June 2021, the conditions of defendant's bond were modified so that she could travel to Florida for about one week. In July 2021, defendant submitted another change of address form, which reflected that she was moving to her father's house. On January 3, 2022,

---

[1]Presumably, defendant's rent and car loan were monthly expenses.

defendant assigned $2000 of her bond money to Dr. Karen Smith, a licensed clinical professional counselor who evaluated defendant and prepared a report.

¶ 6    On September 14, 2022, defendant filed an election to be sentenced under section 5-4-1(c-1.5) of the Corrections Code (see 5 ILCS 70/4 (West 2022) ("If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.")). The State did not concede that section 5-4-1(c-1.5) applied. Defendant entered a blind plea of guilty to committing a drug-induced homicide. The court admonished defendant about sentences that could be imposed, including a sentence under section 5-4-1(c-1.5), and the rights she was giving up by pleading guilty. The factual basis for the plea revealed that, on August 12, 2017, defendant had a text conversation with Haseltine about obtaining drugs and defendant agreed to supply her with some. A Western Union account, which was used to pay for the drugs, showed that defendant collected the money for the drugs as part of the transaction. When police interviewed defendant, she said that she and a man named Mark went to Haseltine's house and "Mark actually reached over [defendant] to hand a package of what [defendant] thought was heroin to *** Haseltine on that particular day." Thereafter, Haseltine was found unresponsive in her bathtub. She later died. An autopsy revealed that heroin laced with other drugs was found in Haseltine's system and that her death resulted from the ingestion of these substances. The court accepted the defendant's guilty plea, finding it knowingly and voluntarily made.

¶ 7    Defendant's sentencing hearing was held on December 19, 2022. At that hearing, various documents were admitted. These included the text messages defendant and Haseltine exchanged, Western Union business records, the psychosocial report Smith prepared, and defendant's presentence investigation report (PSI).

¶ 8    The text messages showed that Haseltine contacted defendant on the morning of August 12, 2017. Haseltine asked defendant if she or defendant's ex-boyfriend could "help [her] out" and "grab one of those," for which Haseltine would "pay [defendant] extra on top of that." Haseltine then offered to "send[ ] the money to W[estern ]U[nion]" so that defendant could "go into the currency [exchange] with [her identification card] and grab it." Defendant texted Haseltine her address, and Haseltine texted defendant the control number she needed to collect the money at the currency exchange. Defendant replied, "[M]ark said he should have stuff around 1 anyways." Defendant then told Haseltine that she would contact her when she left work. Haseltine texted that she sent defendant $58, and defendant confirmed that she would "drop it off by [Haseltine]." Defendant asked Haseltine how much she wanted, and Haseltine asked defendant to "see if [she] could get 50 and split it." At 2:16 p.m., defendant texted Haseltine, telling her that she was on her way to "get Mark," and she estimated that they would be at Haseltine's house at 2:40 p.m. At 3:02 p.m., defendant texted Haseltine that she was "[h]ere."

¶ 9    The Western Union documents revealed that Haseltine sent $58 to defendant on August 12, 2017, at 11:45 a.m. Defendant collected the payment later that day.

¶ 10    The report Smith prepared, which was based on various documents and interviews Smith had with defendant and her father in February and August 2022, reflected that defendant had lived in her ex-boyfriend's apartment in Bolingbrook. She left there, moved in with a friend who lived in southern Illinois, and slept on the friend's couch.

¶ 11    Smith indicated that defendant was slow academically and, although she got along well with people, she was easily influenced by others. Defendant, who expressed extreme remorse for Haseltine's death, reported that she had attempted to commit suicide by swallowing a bottle of Xanax. In an excerpt of the police interview that Smith reviewed, Smith learned that Mark was

defendant's ex-roommate and defendant had driven Mark to Haseltine's home because Mark did not have a driver's license.

¶ 12    The PSI showed that defendant drove while under the influence of alcohol (DUI) on March 14, 2022, while she was out on bond in this case. A month later, she was convicted of that offense and sentenced to 12 months of supervision and DUI counseling. Defendant was employed as a server at Cracker Barrel, earning $7.20 per hour plus tips. Monthly, defendant paid $900 in rent, $340 toward her car loan, and $126 for automobile insurance. She also had an outstanding balance of $3000 on her credit card.

¶ 13    Other evidence presented at the hearing revealed that Haseltine's father paid $4492.64 for Haseltine's funeral. A bill from the funeral home admitted at the hearing confirmed this. Haseltine's father paid for the funeral out of pocket and was never reimbursed.

¶ 14    Haseltine's father and sister testified about how Haseltine's death negatively affected them and Haseltine's young son. Defendant's friends and family testified that defendant was not a drug user and was hardworking, often working overtime or two jobs. At the time of sentencing, defendant lived in a hotel and worked there in addition to her job as a server at Cracker Barrel. Defendant's friends and family indicated that defendant was gullible, naïve, and easily taken advantage of. She was extremely giving, helping her friends and family financially and emotionally. Defendant's compassion was evidenced by the fact that she repeatedly attempted to help her ex-boyfriend overcome his drug addiction.

¶ 15    Suzanne Rubin, a psychotherapist with "quite a bit of background in assessing risk potential," interviewed defendant and testified at the sentencing hearing. She diagnosed defendant with depression, anxiety, and codependency. Rubin described codependency as "essentially fusing yourself with another person." Both people-pleasing and gullibility were characteristics of

codependency. Rubin asserted that defendant posed no risk to the public and that "the likelihood of recidivism in any regard with [defendant] in [Rubin's] personal and professional opinion [was] extremely low." She reached this conclusion knowing that defendant had committed DUI while out on bond.

¶ 16 In allocution, defendant accepted full responsibility for her actions and apologized to Haseltine's family.

¶ 17 The trial court sentenced defendant to six years' imprisonment. In imposing the sentence, the court considered the PSI and the evidence the parties presented, including all the exhibits. The court found in aggravation that "defendant's conduct caused or threatened serious harm" and "a sentence [was] necessary to deter others from committing the same crime." See 730 ILCS 5/5-5-3.2(a)(1), (7) (West 2022). The court gave "no weight to [defendant] being charged with the offense of DUI," as she "accepted responsibility for that offense shortly after being charged." In mitigation, the court found that "defendant did not contemplate [that] her criminal conduct would cause or threaten serious physical harm to another," she either "ha[d] no history of prior delinquency or criminal activity or ha[d] led a law-abiding life for a substantial period of time before the commission of the present crime," her "criminal conduct was the result of circumstances unlikely to recur," her "character and attitude[ ] *** indicate[d] she [was] unlikely to commit another crime," and she "[was] particularly likely to comply with the terms of a period of probation." See *id.* § 5-5-3.1(a)(2), (7), (8), (9).

¶ 18 In addressing this last point, the court considered whether it should sentence defendant under section 5-4-1(c-1.5) of the Corrections Code. In doing so, the court noted that "[c]ertainly if [it] had broad discretion in imposing a sentence, it may very well be that a term of probation would be appropriate under the very specific facts of this case." The court also found that "[defendant

did] not pose a risk to public safety" and that "the events of August 12, 2017[,] involve[d] the use or possession of drugs" per section 5-4-1(c-1.5). See 730 ILCS 5/5-4-1(c-1.5) (West 2022). However, the court determined that "the phrase ['']use or possession of drugs[''] in conjunction with a mandatory minimum sentence as set forth in the statute does not apply to the offense of drug-induced homicide, a Class X felony."

¶ 19   The court then ordered defendant to pay Haseltine's father $4492.64 in restitution, noting that restitution would be paid from the bond money before any other assessments were satisfied. The State interjected that "the only thing [it] would point out, there's a partial exoneration of the bond, there's 2,000 less." Thus, "there's 2,500 available." The State asked "that that [balance] go to restitution first." Defendant did not object. The State then alerted the court that "[w]e need a date for that, that it needs to be paid by." The court ordered "that the balance should be paid by June 30, 2023." Defendant did not object.

¶ 20   Defendant moved the trial court to reconsider the sentence, challenging the trial court's determination that section 5-4-1(c-1.5) of the Corrections Code did not apply to drug-induced homicide. Defendant did not challenge the restitution order. The court denied the motion.

¶ 21   Four days after the trial court denied her motion to reconsider, defendant filed a notice of appeal. Thereafter, this court granted in part defendant's motion to stay her sentence and set her bond at $100,000, with 10% to apply. Defendant posted the $10,000 appeal bond in the trial court.

¶ 22   This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24   Defendant raises two issues on appeal. She argues that (1) section 5-4-1(c-1.5) of the Corrections Code applies to drug-induced homicide and (2) the restitution order is improper

because the trial court failed to set the manner and method of paying restitution in light of defendant's ability to pay. We consider each issue in turn.

¶ 25                    A. Section 5-4-1(c-1.5) of the Corrections Code

¶ 26    Resolving whether section 5-4-1(c-1.5) applies to drug-induced homicide necessarily begins with interpreting the statute. In interpreting the statute, we are guided by the well-settled rules of statutory construction. "Our primary objective when construing a statute is to ascertain the intent of the legislature and give effect to that intent." *People v. Ramirez*, 2023 IL 128123, ¶ 13. "The best evidence of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning." *Id.* "Statutes must be read as a whole, and all relevant parts should be considered." *Id.* "A reviewing court may also discern legislative intent by considering the purpose of the statute, the problems to be remedied, and the consequences of interpretating the statute one way or another." *People v. Palmer*, 2021 IL 125621, ¶ 53. We "may not depart from the language of the statute by interjecting exceptions, limitations, or conditions tending to contravene the purpose of the [statute]." *Ramirez*, 2023 IL 128123, ¶ 13. We review *de novo* the construction of a statute. *Id.*

¶ 27    Before analyzing section 5-4-1(c-1.5), we find it helpful to consider the purpose of this statutory provision, which, as noted above, the canons of statutory construction allow us to do.[2] "The intent of [the] legislation [was] to empower the Judiciary to act appropriately." 101st Ill. Gen. Assem., Senate Proceedings, May 24, 2019, at 20 (statements of Senator Sims). Section 5-4-1(c-

---

[2]Section 5-4-1(c-1.5) (730 ILCS 5/5-4-1(c-1.5) (West 2020)) was introduced by House Bill 1587 (101st Ill. Gen. Assem., House Bill 1587, 2019 Sess.) and added to the Illinois Compiled Statutes by Public Act 101-652, § 20-5 (eff. July 1, 2021).

1.5) was enacted "to reform our criminal justice system, to tear down the problems that we have, *** because of the mandatory minimum sentencing." *Id.* The legislators were "not removing the mandatory minimum[s], [but] allowing the [trial] judge to deviate" (101st Ill. Gen. Assem., House Proceedings, Apr. 11, 2019, at 177 (statements of Representative Harper)) and "impose something other than that mandatory minimum and get the [defendant] back to functioning in society as quickly as possible" (101st Ill. Gen. Assem., House Proceedings, Apr. 11, 2019, at 179-80 (statements of Representative Connor)). In doing so, the legislators wanted to "treat the Judiciary as they are, a co-equal branch of government," and ensure that the legislators were not "stand[ing] as a super-judiciary." 101st Ill. Gen. Assem., Senate Proceedings, May 24, 2019, at 19 (statements of Senator Sims). Although there were discussions about the breadth of offenses that would or would not fall under this provision (see 101st Ill. Gen. Assem., House Proceedings, Apr. 11, 2019, at 175 (statements of Representative Bryant) (specifically mentioning that drug-induced homicide would not be included); 101st Ill. Gen. Assem., Senate Proceedings, May 24, 2019, at 17 (statements of Senator McClure) (expressing concern that "any offense that involves the use or possession of drugs that is currently not eligible for probation would now be eligible for probation at the discretion of *** the judge")), it was noted that "the language that [the legislators] us[ed] was approved by and came from the [Cook County] State's Attorney" (101st Ill. Gen. Assem., House Proceedings, Apr. 11, 2019, at 177 (statements of Representative Harper)).

¶ 28    With this in mind, we turn to examining section 5-4-1(c-1.5) of the Corrections Code, which provides:

> "Notwithstanding any other provision of law to the contrary, in imposing a sentence for an offense that requires a mandatory minimum sentence of imprisonment, the court may instead sentence the offender to probation, conditional discharge, or a lesser term of

imprisonment it deems appropriate if: (1) the offense involves the use or possession of drugs, retail theft, or driving on a revoked license due to unpaid financial obligations; (2) the court finds that the defendant does not pose a risk to public safety; and (3) the interest of justice requires imposing a term of probation, conditional discharge, or a lesser term of imprisonment. The court must state on the record its reasons for imposing probation, conditional discharge, or a lesser term of imprisonment." 730 ILCS 5/5-4-1(c-1.5) (West 2022).

For purposes of this appeal, we find it necessary to determine only whether, under section 5-4-1(c-1.5), drug-induced homicide (1) is "an offense that requires a mandatory minimum sentence of imprisonment[ ]" and (2) "involves the use or possession of drugs." *Id.*

¶ 29     First, we consider whether drug-induced homicide is "an offense that requires a mandatory minimum sentence of imprisonment." *Id.* As charged here, drug-induced homicide is a Class X felony. 720 ILCS 5/9-3.3(b) (West 2018). A defendant convicted of a Class X felony faces a prison sentence between 6 and 30 years. 730 ILCS 5/5-4.5-25(a) (West 2018). This six-year sentence is a mandatory minimum. See *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 29. Thus, section 5-4-1(c-1.5) of the Corrections Code applied to defendant insofar as the offense to which she pleaded guilty, *i.e.*, drug-induced homicide, was an offense that required the trial court to impose a minimum sentence.

¶ 30     We next consider whether drug-induced homicide is one of the enumerated offenses as to which the trial court can exercise its discretion and impose a sentence less than the minimum if the remaining conditions specified in section 5-4-1(c-1.5) are met. Although the State recognizes that drug-induced homicide is a Class X felony and that Class X felonies have mandatory minimum sentences, it claims that section 5-4-1(c-1.5) cannot apply to drug-induced homicide because

"[n]one of the enumerated offenses[, *i.e.*, the use or possession of drugs, retail theft, or driving with a revoked license that resulted from unpaid financial obligations,] are Class X felony offenses." We find the State's argument misguided. Nowhere does section 5-4-1(c-1.5) indicate that it excludes Class X felonies. Nor is its applicability otherwise restricted based on the class of the offense. Rather, the enumeration of offenses in section 5-4-1(c-1.5) states simply that "the offense involves the use or possession of drugs, retail theft, or driving on a revoked license due to unpaid financial obligations." 730 ILCS 5/5-4-1(c-1.5) (West 2022). The State would have us find an exception for Class X felonies—an exception for which the legislature did not provide. We simply cannot inject such an exception into section 5-4-1(c-1.5). *Ramirez*, 2023 IL 128123, ¶ 13.

¶ 31    Turning to the offenses enumerated in section 5-4-1(c-1.5), we determine that drug-induced homicide falls within the first type of offense listed: it is an offense that "*involves* the use or possession of drugs." (Emphasis added.) 730 ILCS 5/5-4-1(c-1.5) (West 2022). In construing what the legislature meant by "involves the use or possession of drugs," we find it necessary to look to the dictionary. See *People v. Castillo*, 2022 IL 127894, ¶ 24 ("In determining the plain, ordinary, and popularly understood meaning of a statutory term, it is entirely appropriate to look to the dictionary for a definition of the term."). "Involves" is defined as "to have within or as part of itself: include" or "to relate closely: connect." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/involves (last visited Nov. 15, 2023) [https://perma.cc/FZ3R-TZN5].

¶ 32    In light of this definition, we look to the elements of drug-induced homicide as set forth in section 9-3.3(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-3.3(a) (West 2018)):

"A person commits drug-induced homicide when he or she violates Section 401 of the Illinois Controlled Substances Act or Section 55 of the Methamphetamine Control and

> Community Protection Act by unlawfully *delivering* a controlled substance to another, and
> any person's death is caused by the injection, inhalation, absorption, or ingestion of any
> amount of that controlled substance." (Emphasis added.)

In line with section 9-3.3(a) of the Criminal Code, defendant was charged with drug-induced homicide because she "unlawfully *delivered* heroin, a controlled substance, containing fentanyl, to *** Haseltine." (Emphasis added.)

¶ 33    In light of the above, we conclude that "delivering" a controlled substance for purposes of drug-induced homicide "involves," *i.e.*, is "connect[ed]" to or "include[s]," the use or possession of drugs. More specifically, we conclude that delivering a controlled substance is connected to or includes possession because, without possession, a drug could not be delivered. See 720 ILCS 570/102(h) (West 2018) (" 'Deliver' or 'delivery' means the actual, constructive or attempted transfer of possession of a controlled substance ***."); *People v. Bolar*, 225 Ill. App. 3d 943, 947 (1992) ("While a person can possess something without delivering it, he cannot deliver it without possessing it. Therefore, when the jury found [the defendant] 'delivered' the cocaine, it also necessarily found that he possessed it."); *People v. Fonville*, 158 Ill. App. 3d 676, 687 (1987) ("[P]ossession is necessarily involved where someone intends to manufacture or deliver a controlled substance.").

¶ 34    Supporting our position is *United States v. James*, 834 F.2d 92 (4th Cir. 1987). There, the defendant was charged with possessing cocaine with the intent to distribute and carrying a firearm during a crime of drug trafficking. *Id.* at 92. Drug trafficking was defined as "any felony violation of federal law *involving* the distribution, manufacture, or importation of any controlled substance." (Emphasis added and internal quotation marks omitted.) *Id.* The defendant moved to dismiss the charges brought against him. *Id.* The trial court granted that motion as to carrying a firearm during

a crime of drug trafficking, finding that possessing cocaine with the intent to distribute was not an offense involving distribution. See *id.* The government appealed. *Id.*

¶ 35    The reviewing court concluded that "possession with intent to distribute [was] a crime 'involving' distribution." *Id.* The court observed:

> "[V]iolations 'involving' the distribution, manufacture, or importation of controlled substances must be read as including more than merely the crimes of distribution, manufacturing, and importation themselves. Possession with intent to distribute is closely and necessarily involved with distribution. In fact, the line between the two may depend on mere fortuities, such as whether police intervene before or after narcotics have actually changed hands." *Id.* at 93.

The court also observed:

> "[T]his interpretation is necessary to give rational effect to [the carrying-a-firearm-during-drug-trafficking provision]. The statute is obviously intended to discourage and punish the deadly violence too often associated with drug trafficking. Such violence can readily occur when drug traffickers attempt to protect valuable narcotics supplies still in their possession or attempt to stop law enforcement officials from disrupting intended transactions. [The carrying-a-firearm-during-drug-trafficking statute] ought not to be interpreted so narrowly as to exclude such dangerous situations." *Id.*

¶ 36    The same is true here. First, "involves the use or possession of drugs" must include more than just use or possession. As observed in *James*, possession is closely and necessarily involved with distribution—here, delivery, which section 9-3.3(a) of the Criminal Code requires.[3] Further,

---

[3] Distribute is synonymous with deliver. See Merriam-Webster Online Thesaurus,

construing section 5-4-1(c-1.5) of the Corrections Code as applying to only use-or-possession drug offenses not only entails that we exclude the term "involves," which we cannot do, but also frustrates the legislative purpose, which is to undo the harm that the extensive mandatory minimum sentencing laws created. See *In re S.P.*, 297 Ill. App. 3d 234, 238 (1998) (noting that "several offenses under the [Corrections Code] carry mandatory minimum sentences").

¶ 37    The State argues that section 5-4-1(c-1.5) does not apply to drug-induced homicide because "[n]oticeably absent from this provision is any indication the legislature sought to include any offense that involved the 'delivery' of a controlled substance." We find the State's argument unavailing. The fact that the legislature did not include the term "delivery" in the phrase "use or possession of drugs" does not mean that drug-induced homicide, an offense requiring the delivery of a controlled substance, does not fall under this provision. Section 5-4-1(c-1.5) applies to offenses that "*involve*[ ] the use or possession of drugs" (emphasis added) (730 ILCS 5-4-1(c-1.5) (West 2022)), *not* simply the use or possession of drugs. If the legislature wanted to limit section 5-4-1(c-1.5) to only use-or-possession drug offenses, it would not have modified the phrase "use or possession of drugs" with the term "involves." Taking the State's position would require us to disregard the term "involves," which would render that term completely meaningless. See *Chapman v. Chicago Department of Finance*, 2023 IL 128300, ¶ 39 (noting that appellate court's failure to construe clause in statute violated rules of statutory construction because it rendered that clause superfluous). We simply cannot do that. See *id.*

---

https://www.merriam-webster.com/thesaurus/deliver    (last    visited    Nov.    15,    2023) [https://perma.cc/MN7L-ASUC].

¶ 38    While we come to our decision here by "giv[ing] undefined statutory words and phrases their natural and ordinary meanings" "[a]nd *** enforc[ing] the clear and unambiguous language as written, without resort to other aids of construction, *e.g.*, legislative history" (*People v. Cavitt*, 2021 IL App (2d) 170149-B, ¶ 167), had we found the statute ambiguous, the legislative history in this matter would support our reading. As noted, the legislature was warned that this law could encompass drug-induced homicide. See 101st Ill. Gen. Assem., Senate Proceedings, May 24, 2019, at 16 (statements of Senator McClure) (noting that "there's an entire category of if the offense involves the use or possession of drugs, and it could be any offense. Why is that so ambiguous, Senator, versus the other two offenses, which are very specific?"). Aware of this fact, the legislators voted to add section 5-4-1(c-1.5) of the Corrections Code.

¶ 39    As a final matter, we note that the mere fact that section 5-4-1(c-1.5) of the Corrections Code applies to drug-induced homicide does not mean that every defendant convicted of that offense will be subject to sentencing under this provision. Rather, even though drug-induced homicide is "an offense that requires a mandatory minimum sentence" and "involves the use or possession of drugs," a sentence under section 5-4-1(c-1.5) is allowed only if all the other conditions are met. 730 ILCS 5/5-4-1(c-1.5) (West 2022). That is, the trial court must still "find[ ] that the defendant does not pose a risk to public safety" and that "the interest of justice requires imposing a term of probation, conditional discharge, or a lesser term of imprisonment." *Id.* Moreover, as an additional safeguard, imposing a sentence under section 5-4-1(c-1.5) requires that the trial court "must state on the record its reasons for imposing probation, conditional discharge, or a lesser term of imprisonment." *Id.*

¶ 40    Given that section 5-4-1(c-1.5) applies to drug-induced homicide, we grant defendant the relief for which she asks, *i.e.*, a remand for a new sentencing hearing. In doing so, we stress that

we express no opinion on whether defendant should be sentenced under section 5-4-1(c-1.5) of the Corrections Code.

¶ 41                                        B. Restitution

¶ 42    Defendant argues that the restitution order was improper because the trial court failed to set the manner and method of payment in light of her ability to pay. Defendant recognizes that she forfeited this issue when she did not object to the restitution order at sentencing and challenge the order in her motion to reconsider the sentence. See *People v. Enoch*, 122 Ill. 2d 176, 198 (1988). Nevertheless, she asks us to consider the issue under the plain-error rule. The State argues that plain-error review is inappropriate because no error occurred.

¶ 43    "Generally, on appeal, we consider forfeited for appeal any issue not raised at trial and in a posttrial motion." *People v. D'Alise*, 2022 IL App (2d) 210541, ¶ 21. However, "[f]orfeiture does not apply when the issues raised fall within the parameters of the plain-error rule." *Id.* ¶ 23. Forfeited errors in sentencing, of which restitution is a part, may be reviewed under the plain-error rule if the error is plain and the defendant shows that either "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." (Internal quotation marks omitted.) *People v. Adame*, 2018 IL App (2d) 150769, ¶ 12; see *D'Alise*, 2022 IL App (2d) 210541, ¶¶ 23, 28.

¶ 44    Defendant argues that the trial court's imposition of restitution without setting the manner and method of payment in light of her ability to pay is reviewable under the second prong of the plain-error rule. We agree. See *D'Alise*, 2022 IL App (2d) 210541, ¶ 24.

¶ 45    The first step in reviewing an issue under the plain-error rule is deciding whether " 'plain error' occurred." *People v. Quezada*, 2022 IL App (2d) 200195, ¶ 40 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007)). "Plain error" is a " 'clear' " or an " 'obvious' " error.

*Id.* (quoting *Piatkowski*, 225 Ill. 2d at 565 n.2). Thus, we address whether a clear or obvious error arose when the trial court did not (1) consider defendant's ability to pay restitution and, based thereon, (2) set the manner and method of paying restitution.

¶ 46 "Generally, a trial court's order for restitution will not be disturbed on appeal absent an abuse of discretion." *D'Alise*, 2022 IL App (2d) 210541, ¶ 26. "A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would adopt the court's view." *Id.* That said, an order for restitution must comply with section 5-5-6 of the Corrections Code (730 ILCS 5-5-6 (West 2022)). *D'Alise*, 2022 IL App (2d) 210541, ¶ 27. A claim that an order for restitution failed to comply with section 5-5-6 of the Corrections Code is reviewed *de novo*. *Id.* Because defendant's arguments concern whether the order for restitution complied with the statutory requirements, our review here is *de novo*. See *id.*

¶ 47 Considering whether the restitution order here complied with section 5-5-6 of the Corrections Code mandates that we construe this statute. In doing so, we are again guided by the well-settled rules of statutory construction outlined above.

¶ 48 Section 5-5-6(f) of the Corrections Code covers the issues raised here. It provides, in relevant part:

"Taking into consideration the ability of the defendant to pay, *** the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years, *** not including periods of incarceration, within which payment of restitution is to be paid in full. Complete restitution shall be paid in as short a time period as possible. *** If the defendant is ordered to pay restitution and the court orders that restitution is to be paid over a period greater than 6 months, the court shall order that the defendant make monthly payments; the court may waive this requirement of

monthly payments only if there is a specific finding of good cause for waiver." 730 ILCS 5-5-6(f) (West 2022).

¶ 49    In *D'Alise*, this court considered the application of section 5-5-6(f) in a situation similar to that presented here. There, the defendant, an unlicensed dentist who was convicted of the unlicensed practice of dentistry, was ordered to pay restitution to two former patients who were injured by the defendant or those he employed. *D'Alise*, 2022 IL App (2d) 210541, ¶¶ 1, 9-10. In entering the restitution order, the trial court did not make a specific finding about the defendant's ability to pay or specify the time frame for the defendant to pay all the restitution. *Id.* ¶ 13.

¶ 50    On appeal, we determined that "a trial court is not required to expressly state that it considered a defendant's ability to pay" when ordering the defendant to pay restitution. *Id.* ¶ 51. Rather, we concluded that "there need only be sufficient evidence before the court concerning the defendant's ability to pay." *Id.* The trial court in *D'Alise* had sufficient evidence before it to determine that the defendant was able to pay restitution. *Id.* However, we determined that this fact "d[id] not mean that the restitution order [was] proper." *Id.* ¶ 55. Rather, we noted that a trial court ordering restitution must set the manner and method of making payments and, in doing so, "must specifically consider a defendant's ability to pay restitution." *Id.* We observed that, for example, "a court should consider that a defendant with many liquid assets might be able to easily pay a small amount of restitution in a very short time, while a defendant with no assets might not." *Id.* Because the trial court "fail[ed] to define the time during which [the] defendant must pay all the restitution," we "remand[ed] th[e] case for the limited purpose of allowing the trial court to determine the time frame for [the] defendant to pay restitution in full." *Id.* ¶¶ 61-62.

¶ 51    Here, as in *D'Alise*, evidence before the trial court suggested that defendant had the ability to pay restitution. Although defendant had debt and had lived with friends and family, presumably

for free, she had money to obtain a private attorney and travel to Florida, had worked steadily for several years, and was working two jobs and living in a hotel when the trial court ordered her to pay restitution. That said, we note that the trial court here, like the trial court in *D'Alise*, failed to set the manner and method of paying restitution in light of defendant's ability to pay. More problematic is the fact that the trial court's order, which was entered on December 19, 2022, seemed to require defendant to pay restitution in a lump sum, as it ordered only that restitution had to be paid by June 30, 2023. The difficulty is that June 30, 2023, was 6 months and 11 days after the order for restitution was entered. Because this was "greater than 6 months," the court had to "order that *** defendant make monthly payments" or "waive this requirement of monthly payments only if there [was] a specific finding of good cause for waiver." 730 ILCS 5/5-5-6(f) (West 2022). The trial court did neither. That is, it neither set monthly payments nor specifically found that monthly payments were waived for good cause. Thus, although the overage of 11 days may seem *de minimis*, it is nonetheless outside the six months our legislature set and is, therefore, improper.

¶ 52    Given the above, we conclude, as we did in *D'Alise*, that the failure to define the manner and method of paying restitution is a clear and obvious error. Thus, even though defendant forfeited this issue by failing to raise it in the trial court, we invoke the plain-error rule to review it and find that the restitution order is improper.

¶ 53    The State argues that "[w]here, as here, the trial court was silent as to the specific payment schedule[ ], it may be inferred that the court did not intend restitution to be paid over a period but rather intended a single payment." In making this argument, the State relies on *People v. Brooks*, 158 Ill. 2d 260 (1994). There, the defendant was convicted of armed robbery, sentenced to 10 years' imprisonment, and ordered to pay $2767.93 in restitution within two years after his release

from prison. *Id.* at 262. At issue before our supreme court was whether the requirement in section 5-5-6(f) that a trial court "fix a period of time not in excess of 5 years" for payment of restitution meant 5 years from the defendant's sentencing or 5 years from the defendant's release from prison. (Emphasis and internal quotation marks omitted.) *Id.* at 263-64. Our supreme court determined that this five-year period could run from either time. *Id.* at 263, 267-68.[4] In light of that holding, the court did not analyze in depth the defendant's argument that the restitution order was improper because it failed to set the manner and method of payment. See *id.* at 272. Specifically, the court asserted:

> "We do not consider at length an additional argument raised by [the] defendant that the [restitution] order was inappropriate for its failure to specify the method and manner of payment. [Citation.] The trial court's failure to define a specific payment schedule is understandable, given that [the] defendant had yet to serve his [prison] term and the regularity and amount of his future income, if any, was unknown. [Citation.] Furthermore, it is appropriate to infer from the trial court's failure to specify a payment schedule that restitution is to be made in a single payment. [Citation.] Under such circumstances, the [restitution] order's lack of specificity is not unreasonable." *Id.* at 272.

¶ 54 Notably, section 5-5-6(f) as applied in *Brooks* required, as it does now, monthly restitution payments if the restitution period exceeded six months, unless the court made "a specific finding of good cause for waiver" of the monthly-payment requirement (see Ill. Rev. Stat. 1991, ch. 38,

---

[4]The version of section 5-5-6(f) of the Corrections Code in effect when *Brooks* was decided did not provide, as it does now, that the time within which a defendant had to pay restitution excluded any time the defendant was incarcerated. See Ill. Rev. Stat. 1991, ch. 38, ¶ 1005-5-6(f).

¶ 1005-5-6(f)). Curiously, although the restitution period in *Brooks* exceeded six months (see *Brooks*, 158 Ill. 2d at 262) and the trial court neither required monthly payments nor (apparently) found good cause for waiver, the supreme court did not discuss whether the trial court erred in that respect. Nonetheless, the plain language of section 5-5-6(f) constrains us to hold that the trial court in this case erred by not making a specific finding of good cause for waiving the monthly-payment requirement, where the restitution period exceeded six months. See *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 82 (compliance with section 5-5-6(f) is mandatory).

¶ 55     As a final matter, we note that the State asks us to take judicial notice of the fact that defendant posted an appeal bond of $10,000, she is not currently in custody, and an outstanding balance of $1992.64 in restitution remains. In her reply brief, defendant notes that her father posted her appeal bond and did not receive notice that the bond could be used to satisfy the restitution order. Defendant intimates that, given the lack of notice, the appeal bond cannot be used to satisfy the outstanding amount of restitution.

¶ 56     We do not consider here how, if at all, the appeal bond affects the restitution order. We simply order, consistent with *D'Alise*, that the trial court on remand set the manner and method for paying restitution in light of defendant's ability to pay. In doing so, we express no opinion on whether the appeal bond can be used to pay restitution.

¶ 57                                 III. CONCLUSION

¶ 58     For these reasons, we vacate defendant's six-year sentence and remand this cause for the trial court to (1) consider whether to impose a sentence under section 5-4-1(c-1.5) of the Corrections Code and (2) set the manner and method of paying restitution in light of defendant's ability to pay. We otherwise affirm the judgment of the circuit court of Kendall County.

¶ 59     Affirmed in part and vacated in part; cause remanded with directions.

¶ 60    JUSTICE JORGENSEN, specially concurring:

¶ 61    While I concur in the majority's decision to remand this cause for a new sentencing hearing, I write separately to voice my concerns with the breadth of the result.

¶ 62    On appeal, defendant calls attention to the fact that she should have been eligible for sentencing under section 5-4-1(c-1.5) because her drug-induced homicide conviction required a mandatory minimum sentence of imprisonment and "involve[d] the use or possession of drugs." 730 ILCS 5/5-4-1(c-1.5) (West 2022). As the majority correctly points out, sentencing eligibility under section 5-4-1(c-1.5) is not limited to *only* the "use or possession of drugs" but also includes all offenses *involving* the possession of drugs—including the delivery of drugs.

¶ 63    I am left troubled, however, because I do not believe, based on the legislators' comments at the House and Senate proceedings, that the General Assembly intended for all possession-, use-, and *delivery*-related offenses to be encompassed in the new sentencing scheme. While I am wary of the eventual application of this sentencing provision, I acknowledge that the plain language and the legislative history support the majority's decision. However, if the legislature takes issue with the potential broad application of section 5-4-1(c-1.5) to *all* delivery offenses, then I hope it takes the opportunity to clarify its intent.

---

*People v. Hoffman*, **2023 IL App (2d) 230067**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 18-CF-395; the Hon. Robert P. Pilmer, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Ann Fick, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---